[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-13885
_____

D.C. Docket No. 4:11-cv-03336-VEH

JOE TAYLOR,
JEFF MAYBEN,
LECIL HARRELSON,
JEFF MORRIS,
JOHN ALAN CALVERT,
DAVID PUTMAN,
DERRECK SHERRILL,
on behalf of themselves and all others similarly situated,

Plaintiffs - Appellants,

versus

CITY OF GADSDEN,
an Alabama Municipal corporation,
SHERMAN GUYTON,
in his official capacity as Mayor of the City of Gadsden,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(September 16, 2014)

Before TJOFLAT, Circuit Judge, MOORE,[*] Chief District Judge, and
SCHLESINGER,[*] District Judge.

TJOFLAT, Circuit Judge:

This case presents a problem common to most cities in the United States. Their pension funds have been operating at a substantial loss, and the cities' long-term liabilities are becoming unfunded at an exponentially increasing rate. That is, the contributions employees and cities are making to pension funds—as a percentage of the employees' salaries—are being used to pay the pensions earned by retirees instead of being set aside and invested for employees' retirements.

The trend is all too familiar to Gadsden, Alabama. In 2011, its pension program—administered by the State of Alabama but comprised of local funds—had an unfunded liability of $50.9 million. In fact, Gadsden anticipated having to pay 24.54% of its employees' total compensation out of public funds during the

---

[*] Honorable K. Michael Moore, Chief United States District Judge for the Southern District of Florida, sitting by designation.

[*] Honorable Harvey E. Schlesinger, United States District Judge for the Middle District of Florida, sitting by designation.

following year to prevent default. This projected expense contributed to a $1.5 million shortage in Gadsden's proposed budget.

With its back against the wall—and in an effort to resuscitate its flailing pension program—Gadsden raised its employees' pension contributions by 2.5% of their total compensation. It did so pursuant to an Act passed by the Alabama legislature mandating such an increase for state employees and permitting, but not requiring, localities to do the same. In response, a class of Gadsden firefighters[1]— whose contribution rate was raised from 6% to 8.5%—brought this lawsuit. They alleged that the City's actions impaired the terms of their employment contracts, in violation of both the United States Constitution[2] and the Alabama Constitution.[3] After extensive record development, and on cross-motions for summary judgment, the District Court dismissed the complaint for failing to demonstrate that any contractual right had been impaired. We affirm.

---

[1] The initial complaint was a putative class action filed by seven named firefighters—Joe Taylor, Jeff Mayben, Lecil Harrelson, Jeff Morris, John Calvert, David Putman, and Derreck Sherrill. During the litigation, the class was officially certified to include all other firefighters who saw their pension contributions rise. See infra part II.

[2] U.S. Const. art. I, § 10, cl. 1.

[3] Ala. Const. art. I § 22.

I.

Since 1939, Gadsden has provided its firefighters with a pension program as part of their compensation.  Firefighters initially belonged to a local program, the Policemen's and Firemen's Retirement Fund of the City of Gadsden (the "PFRF"). In 2002, concerns about the PFRF's solvency led Gadsden to negotiate a new arrangement with these employees: the City, it was agreed, would terminate the local fund and move all of its assets, liabilities, and members into the Employee Retirement System of Alabama (the "ERS")—a state-administered retirement fund. All Gadsden employees, except for firefighters and police officers, had been members of the ERS since 1970.

Because the current plan's unfunded liability stems from the PFRF, we first describe the PFRF and the consequences of its merger with the ERS in 2002.  We then turn to the events surrounding Gadsden's decision to increase plaintiffs' pension contribution rate.

A.

Alabama Legislative Act 106 of 1939 established the PFRF in Gadsden.[4] Part of the PFRF's funding came from employee contributions.  At the time of the

---

[4] The Act applied to all Alabama cities with a population between 24,000 and 40,000. 1939 Ala. Acts 131; 1931 Ala. Acts 174.  Gadsden qualified as such a city.

4

PFRF's creation, police officers and firefighters were required to contribute 2% of each paycheck to the fund.[5]  Over the years, this contribution rate increased three times: to 4% in 1959,[6] to 10% in 1975,[7] and to 11% in 1983.[8]  In exchange for these contributions, an employee who completed thirty years of consecutive service was entitled to "receive benefits equal to 50% of the final salary received by that person at the time of his or her retirement."  1980 Ala. Acts 674, 682 § 12(2).[9]

But serious concerns eventually arose about the fund's financial health. Doc. 50-9, at 11–12.  The PFRF Board of Trustees[10] received several actuarial reports concluding that the PFRF did not have enough resources to meet its long-term obligations, and retiree benefits were being paid out as fast as current contributions were being paid in.  Doc. 50-5, at 8–9.  In short, the fund was "going

---

[5] 1939 Ala. Acts 131, 133 § 5.

[6] 1959 Ala. Acts 765, 767–68  § 5(c).

[7] 1975 Ala. Acts 1787, 1790–91 § 5(h).

[8] 1980 Ala. Acts 674, 678 § 5(j) (requiring members of the police and fire departments to pay 10% from 1980 to 1982 but increasing the rate to 11% beginning January 1, 1983).

[9] This provision only applied to members who had become employees on or after October 1, 1975.  Id. at 682 § 12(2).  Employees who had begun work at an earlier date were eligible to receive benefits after only twenty years of service.  Id. at 681 § 12(2).

[10] In its final form, the PFRF was governed by a board of trustees comprised of Gadsden's Commissioner of Public Safety and three representatives each from both the police and fire departments.  Id. at 675 § 3.

5

broke," and there was a serious chance that Gadsden's police officers and firefighters "were going to wake up one day and not have a pension plan." Id. As a result, Gadsden's mayor began considering the possibility of moving PFRF's members into the ERS.

Established in 1945, the ERS is a statewide pension program designed "to provide retirement and other benefits to state employees, state police, and on an elective basis to qualified persons of cities, towns, and quasi-public organizations." The Retirement Systems of Alabama, http://www.rsa-al.gov/index.php/members/ers (last visited Aug. 26, 2014). Participation in the ERS is mandatory for all Alabama state employees, as well as for the employees of any Alabama locality that has elected to participate in the program.[11] Ala. Code §§ 36-27-4(a)(1), 36-27-6. Gadsden joined the ERS in 1970, and all of its

---

[11] State employees who were hired before the ERS's enactment could choose to opt out of joining the program. 1945 Ala. Acts 734, 736 § 3(2). Similarly, the employees of an Alabama locality at the time it elected to join the ERS had the option of whether to enroll as ERS participants. Id. at 749 § 12(2). Alabama Code § 36-27-6(a) authorizes

> [t]he governing board of any county, city, town or public or quasi-public organization of the state or of any political subdivision thereof . . . by resolution legally adopted . . . [to] elect to have its officers and employees from whatever sources and in whatever manner paid become eligible to participate in the retirement system.

6

employees—other than its firefighters and its police officers—have since participated in the fund.[12]  Doc. 10-8, at 1.

Under the terms of the ERS—as provided by statute—an employee with ten years of "creditable service"[13] shall be eligible to retire with benefits upon reaching age 60.  Ala. Code § 36-27-16(a)(1)(a).[14]  An employee with twenty-five years of creditable service is eligible to retire with benefits regardless of age.[15]  Id. § 36-27-16(a)(1)(c).  After retirement, these employees will receive compensation from the

---

[12] Although ERS participation is generally mandatory for all employees of a locality that has elected to participate, the statute carves out an exception for local employees who were already members of a public pension plan at the time of the locality's decision to participate in the ERS.  Ala. Code § 36-27-6(d).  For these members to join, a series of steps must be taken.  First, "a majority of the members of [the local retirement system]" must "elect to become members of [the ERS], by a petition duly signed by such members."  Id.  Second, the governing board of the city or town that employs these members must pass a resolution electing to have them participate in the ERS.  Id. (referencing the procedure outlined in Ala. Code § 36-27-6(a)).  Finally, the ERS Board of Control has the option of whether to accept a local pension program into the ERS.  Id. (same).

[13] "Creditable service" is calculated by adding an employee's length of "prior service" and "membership service."  Ala. Code § 36-27-1(10).  "Membership service" includes "[s]ervice as an employee rendered while a member of the retirement system and on account of which contributions are made."  Id. § 36-27-1(9).  "Prior service" encompasses an assortment of work completed prior to "the date of establishment of the retirement system."  Id. § 36-27-1(8); see also id. § 36-27-11 (enumerating various categories of prior service).

[14] Since the filing of this case, the Alabama legislature has amended the benefits provision of the ERS to provide different standards for "Tier II" employees who began work after January 1, 2013.  None of these provisions apply to any of the plaintiffs in this case, so we refrain from discussing them further.

[15] Firefighters and local police officers who participate in the ERS earn one additional year of creditable service every five years, on account of their hazardous work conditions.  Ala. Code § 36-27-59(b)(1).  These additional retirement credits, however, are only available "upon attainment of the requisite years of creditable service" and cannot be used to meet the minimum requirements for retirement eligibility.  Id.; see Doc. 50-28, at 17.

7

ERS in an amount calculated according to their final pay and their total length of service.[16]

Like the PFRF, the ERS requires mandatory employee contributions to the pension fund. The employee contribution rate has changed over time. All employees initially contributed 3.5% of their total pay.[17] That rate has increased twice: to 4% in 1965,[18] and to 5% in 1975.[19] The contribution rate for firefighters and local police officers was raised separately to 6% in 2001.[20] State police officers have had their employee contribution rates raised three times: to 7% in 1957,[21] to 8% in 1965,[22] and to 10% in 1971.[23]

In addition to employee contributions, the funding for ERS comes from employer contributions and from investment income. Doc. 47-5 at 33. Although

---

[16] Upon retirement, ERS participants will receive payments that annually total at least "[t]wo and one-eightieth percent of the member's average final compensation multiplied by the number of years of his or her creditable service." Ala. Code § 36-27-16(a)(2)(c)(1). This final compensation is set as "the average annual compensation . . . during the three years, in [the employee's] last 10 years of creditable service for which the average is highest." Id. § 36-27-1(15).

[17] 1945 Ala. Acts 734, 744 § 8(1)(b).

[18] 1965 Ala. Acts 468, 476 § 2.

[19] 1975 Ala. Acts 2680, 2687 § 4.

[20] 2000 Ala. Acts 1335, 1336 § 2(b). Specifically, this increase applied to firefighters, correctional officers, and police officers (excluding state police).

[21] 1957 Ala. Acts 59, 65 § 3.

[22] 1965 Ala. Acts 468, 476 § 2.

[23] 1971 Ala. Acts 2490, 2502–03 § 4.

8

all funds are co-mingled and invested by the ERS leadership, each locality participating in the ERS has a separate account maintained on its own behalf. Doc. 47-1, at 98. Local employers are responsible for making their own contributions at a rate set by the ERS leadership. Ala. Code § 36-27-6(f). The employer contribution rate varies from year to year according to the assets and liabilities of a given locality's individual account. Id.

In 2002, amid concerns about the long-term viability of the PFRF, Gadsden's mayor looked to the City's ERS account for a lifeline. That account, in the mayor's words, was "solid as a rock." Doc. 50-5, at 10. And in fact, Gadsden's ERS account was so financially sound that, in 2001, it was completely funded; its employer contribution rate, moreover, was set at just 1.51%. Doc. 47-5, at 202–03. Impressed by the stability of the ERS account, Gadsden's mayor requested that both the police and fire departments appoint a committee to discuss the possibility of moving the PFRF into the ERS. Doc. 47-8, at 10–12.

It should come as little surprise, then, that a majority of PFRF members ultimately agreed that joining the ERS was a prudent choice.[24] This consensus was

---

[24] In exchange for the City's agreeing to take on the PFRF's unfunded liabilities, merger with Gadsden's ERS account was contingent upon the creation of a "Supplemental Fund." Doc. 10-4 at 1–2. Former PFRF members financed the fund; the City withheld an additional 5% of their compensation—over and above the 6% contribution rate already required by the ERS—for

the result of prolonged discussion between the PFRF members and the City. See Taylor v. City of Gadsden, 958 F. Supp. 2d 1287, 1304–06 (N.D. Ala. 2013). Plaintiffs also had access to the official ERS employee handbook, which explicitly stated that the "member contribution rate is determined by statute and subject to change by the Alabama Legislature." Doc. 50-27, at 9.

On October 8, 2002, Gadsden issued a resolution that dissolved the PFRF, moving its members, its assets, and its liabilities into Gadsden's ERS account. Doc. 10-8, at 1–2 . Saddled with the PFRF's expansive unfunded liabilities, the ERS account quickly went from 100% funded in 2001 to only 58.2% funded by 2007. Doc. 47-5, at 202–03. Over this same period of time, Gadsden's employer contribution rate increased from 1.51% to 24.54%. Id. And there it lingered for years as the City worked, bit by bit, to pay down the debts acquired from the PFRF. Despite these efforts, the extent of the ERS's unfunded liabilities totaled $50.9 million in 2011. Id. at 202.

---

a period of three years. The money earned from these withholdings went toward paying off the PFRF's remaining unfunded liabilities. Id.

B.

The rate increase at issue in this case traces its roots to an Act of the Alabama legislature ("Act 676")[25] and a subsequent resolution by the City of Gadsden made pursuant to that Act. The economic downturn took its toll on the ERS, which, like all pension programs, is funded in part by investment income. So when state officials reported "the worst performance of the stock market in a rolling 10 years in 175 years," the Alabama legislature had to find a way to rescue the fund from potential default. See Doc. 47-5, at 34. Its solution was Act 676. The Act sought to shore up the ERS by increasing the contribution rates paid by all Alabama state employees. For example, Alabama law enforcement officers, firefighters, and correctional officers saw their rates increase from 6% to 8.25% in 2011 and then from 8.25% to 8.5% in 2012. Ala. Code § 36-27-59(b)(2).

But by its terms, the Act only concerned the contribution rates of state employees. It gave localities participating in the ERS the option of applying these state-level increases to their own employees (the "local option"). See id. ("Any employer participating under Section 36-27-6, by adoption of a resolution, may elect for the increases in employee contributions provided by this act adding this language to be withheld from the earning compensation of employees to the

---

[25] 2011 Ala. Acts 1805, 1821 (codified at Ala. Code § 36-27-59(b)(2)).

11

employer."). In August 2011, Gadsden accepted this invitation and passed a resolution "elect[ing] to come under the provision of [Act 676]" and "increase employee contribution rates as specified by [the Act]." Doc. 10-10. By exercising the local option, Gadsden reduced its own employer contribution rate by 2% and closed its $1.5 million budget gap by approximately $500,000. Doc. 47-5, at 203; Doc. 47-1, at 94.[26]

## II.

In response to Gadsden's adoption of the local option, seven Gadsden firefighters brought this lawsuit against both the City of Gadsden and its mayor, alleging that the increase in their contribution rate violated the contractual protections of both Article I, § 10 of the United States Constitution and Article I, § 22 of the Alabama Constitution.[27] Plaintiffs sought a declaratory judgment as well as "[p]reliminary and permanent injunctive relief restraining [Gadsden] from

---

[26] True, "[i]t is undisputed that, when the City passed the pension increase resolution in August 2011, it was not in a fiscal emergency." Taylor v. City of Gadsden, 958 F. Supp. 2d 1287, 1314 (N.D. Ala. 2013). But in an effort to "keep the City sound" during difficult economic times, the City considered the local option the best of many bad choices—including layoffs and reductions in city services. Doc. 47-2, at 42–43. And the City's financial data demonstrate that, even after almost a decade since assuming the PFRF's unfunded liabilities, the City's ERS account was still suffering from large, unfunded liabilities and a correspondingly high employer contribution rate. See Doc. 47-5, at 202–03.

[27] We note that plaintiffs' complaint is limited to its two constitutional claims. Doc. 1, at 12–13. Plaintiffs have not brought a state law breach-of-contract action against the City. Compare City of Gadsden v. Harbin, ___ So. 3d ___, 2013 WL 6516387 (Ala. 2013).

12

increasing the contribution rate of firefighter participants in the ERS over 6%."[28]

Doc. 1, at 14. At plaintiffs' request, the District Court expanded the class of

plaintiffs to include "all hazardous duty firefighters employed by the Gadsden Fire

Department since October 1, 2011 that are participants in the ERS." Doc. 32, at 5.

Plaintiffs argued that Gadsden's resolution adopting the local option was

overbroad in that it applied to firefighters who have over ten years of creditable

service and are thus "vested" in the rights of the pension program.[29] Doc. 49, at

67. After discovery, and on cross-motions for summary judgment, the District

Court rejected plaintiffs' constitutional claims and dismissed the case with

prejudice. Taylor v. City of Gadsden, 958 F. Supp. 2d 1287 (N.D. Ala. 2013).

Plaintiffs then lodged this appeal. Doc. 64.

### III.

On appeal, plaintiffs argue that Gadsden firefighters with over ten years of

creditable service have a "vested" right to a contribution rate of 6% and that

---

[28] In a later amendment to their complaint, plaintiffs added a request that defendants pay "each plaintiff and class member backpay, compensatory damages, interest and other remedial relief for the unlawful and excessive withholding of pension contributions." Doc. 28, at 2.

[29] In the District Court, plaintiffs argued that "[t]he terms upon which the former PFRF system were merged into ERS were carefully negotiated between the employees and the City over a two year period from 2000 to 2002." Doc. 49, at 59. Specifically, plaintiffs argued that Gadsden and its firefighters had "contractually agreed on the extent to which the current employees would fund the liabilities to past retirees." Id. Plaintiffs appear to have abandoned this argument on appeal, however, and now point only to the language of the ERS itself as reflecting the terms of their employment contract with the City.

13

Gadsden's decision to raise that contribution rate violated their constitutional rights. This argument relies on the assumption that Gadsden made an implied promise—included in its employment contract with each individual firefighter—not to raise the contribution rate once a firefighter becomes eligible for pension benefits under the terms of the ERS. By breaching this implied promise, plaintiffs allege, Gadsden violated the contractual protections of both the United States Constitution and the Alabama Constitution. The argument proves too much.

The Contract Clause of the United States Constitution provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts."[30] A similarly worded provision in the Alabama Constitution states that "no ex post facto law, nor any law, impairing the obligations of contracts . . . shall be passed by the legislature."[31] Our review of Alabama Supreme Court precedent has convinced us that Alabama's provision has the same scope and purpose as the Contract Clause of the United States Constitution.[32] We now turn to that legal framework.

---

[30] U.S. Const. art. I, § 10, cl. 1.

[31] Ala. Const. art. I, § 22.

[32] We are bound to apply this provision of the Alabama Constitution according to the interpretation given to it by the Alabama Supreme Court. See United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726, 86 S. Ct. 1130, 1139, 16 L. Ed. 2d 218 (1966). The Supreme Court of Alabama has explicitly stated that the two provisions share a common purpose. See Opinion of the Justices No. 333, 598 So. 2d 1362, 1365 (Ala. 1992) ("The purpose of the Contract Clause . . . of the United States Constitution and Article I, Section 22, of the Alabama Constitution of 1901, is 'to preserve sacred the principle of the inviolability of contracts against that legislative

14

A.

The Contract Clause prohibits a State from passing any "law" that impairs the obligation of contracts. As such, the Clause is "aimed at the legislative power of the state," New Orleans Waterworks Co. v. La. Sugar-Refining Co., 125 U.S. 18, 30, 8 S. Ct. 741, 747, 31 L. Ed. 607 (1888), and is "directed against legislative action only," Barrows v. Jackson, 346 U.S. 249, 260, 73 S. Ct. 1031, 1037, 97 L. Ed. 1586 (1953). Legislation is "[t]he process of making or enacting positive law in written form, according to some type of formal procedure, by a branch of government constituted to perform this process." Black's Law Dictionary 982 (9th ed. 2009).

Plaintiffs do not challenge an act of legislation, however. Lost in the fog of litigation, this undisputed point bears emphasis: the contribution rate increase stems from a resolution by the City of Gadsden in 2011, Doc. 10-10, that the City

interference [that] the history of governments has shown to be so imminent, in view of the frequent engendering of popular prejudice, and the consequent fluctuations of popular opinion.'" (alteration in original) (footnote omitted) (quoting Edwards v. Williamson, 70 Ala. 145, 151 (1881))). And when a plaintiff has contended that a particular action violates both the Contract Clause of the U.S. Constitution and § 22 of the Alabama Constitution, the Alabama Supreme Court has made no distinction between the two in analyzing the constitutionality of the challenged act. E.g., Smith v. City of Dothan, 279 Ala. 571, 574–76, 188 So. 2d 532, 534–36 (Ala. 1966) (per curiam). Indeed, the Alabama Supreme Court has noted that the two provisions are "similar in constitutional verbiage" and has used precedent from the U.S. Supreme Court to determine whether a challenged piece of legislation violated the contractual protections of Alabama's own Constitution. City of Birmingham v. Penuel, 242 Ala. 167, 172, 5 So. 2d 723, 726 (Ala. 1942).

15

was permitted—but not required—to adopt pursuant to state law, see Ala. Code § 36-27-59(b)(2).  The State of Alabama is not a defendant in this case.  And the City of Gadsden's decision to implement the local option did not involve an ordinance[33] or a similar act bearing the imprimatur of the State's legislative authority.

Municipalities, it should be remembered, are "bodies politic and corporate." Ala. Code § 11-40-1; see also Laramie Cnty. Comm'rs v. Albany Cnty. Comm'rs, 92 U.S. 307, 308, 23 L. Ed. 552 (1875) ("Counties, cities, and towns are municipal corporations . . . . Beyond doubt, they are, in general, made bodies politic and corporate . . . .").  Creatures of state statute, municipalities are formed "as convenient agencies for exercising such of the governmental powers of the state as may be [entrusted] to them."  Hunter v. City of Pittsburgh, 207 U.S. 161, 178, 28 S. Ct. 40, 46, 52 L. Ed. 151 (1907).  By adopting the resolution, the City acted as would any board of directors faced with a decision about how to best manage the affairs of a corporation.  See 1 Eugene McQuillin, The Law of Municipal Corporations § 2:14 (3d ed. 2010) (noting that "the mayor and council, acting

---

[33] An ordinance "means something more than a mere verbal motion or resolution" and is "local law which is adopted with all the legal formality of a statute."  5 Eugene McQuillin, The Law of Municipal Corporations § 15:2 (3d ed. 2010).  Unlike an ordinance, a resolution "denotes something less solemn or formal" and is "usually a mere declaration with respect to future purpose or proceedings."  Id. (footnotes omitted).

16

officially as the municipal corporation, are analogous to trustees representing the corporation and the public"). That is, the City merely decided on a "particular item of business coming within [its] official cognizance . . . relating to the administrative business of the municipality." Id. § 15:2. As a result, the contribution rate increase was not "an exercise of legislative power"; instead, the local option "was established by the [Alabama] legislature" and "its execution [was] committed to the municipal authorities." New Orleans Waterworks Co., 125 U.S. at 31–32, 8 S. Ct. at 748–49; cf. Jamaica Ash & Rubbish Removal Co. v. Ferguson, 85 F. Supp. 2d 174, 183 (E.D.N.Y. 2000) (dismissing a Contract Clause claim because the challenged state action bore "none of the hallmarks of a legislative act; it was an application of the law, not the creation of a law").

Without passing any "law," Gadsden was, at bottom, "doing nothing different from what a private party does." Horwitz-Matthews, Inc. v. City of Chicago, 78 F.3d 1248, 1250 (7th Cir. 1996). As a result, the plaintiffs have no basis upon which to launch a Contract Clause challenge in the first instance.

## B.

Even assuming the City's resolution can properly anchor a Contract Clause challenge, plaintiffs cannot prevail. In evaluating their claim, we must first determine whether the state law at issue "operated as a substantial impairment of a contractual relationship." Allied Structural Steel Co. v. Spannaus, 438 U.S. 234,

17

244, 98 S. Ct. 2716, 2722, 57 L. Ed. 2d 727 (1978).  That inquiry turns on "whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial."  Gen. Motors Corp. v. Romein, 503 U.S. 181, 186, 112 S. Ct. 1105, 1119, 117 L. Ed. 2d 328 (1992).  Assuming a substantial impairment of a contractual relationship has taken place, the challenged law will nonetheless pass constitutional muster if it is "reasonable and necessary to serve an important public purpose."  U.S. Trust Co. of N.Y. v. New Jersey, 431 U.S. 1, 25, 97 S. Ct. 1505, 1519, 52 L. Ed. 2d 92 (1997).

1.

For purposes of Contract Clause analysis, the existence of a contract is a federal question.  Romein, 503 U.S. at 187, 112 S. Ct. at 1109–10.  That said, we must "accord respectful consideration and great weight to the views of the State's highest court" when making this determination.  Id. (quoting Indiana ex rel. Anderson v. Brand, 303 U.S. 95, 100, 58 S. Ct. 443, 446, 82 L. Ed. 685 (1938)).  In doing so, we must be mindful that, as a constitutional matter, "the word 'contracts' . . . is used in its usual or popular sense as signifying an agreement of two or more minds, upon sufficient consideration, to do or not to do certain acts."  Crane v. Hahlo, 258 U.S. 142, 146, 42 S. Ct. 214, 215, 66 L. Ed. 514 (1922).

Despite ample discovery, no party has produced the written agreement between the firefighter-employees and the City, nor is there much evidence about what the terms of such a writing might contain.  We look instead to the statutory provisions that govern the ERS.  When engaging in such a review, we must "proceed cautiously both in identifying a contract within the language of a regulatory statute and in defining the contours of any contractual obligation." Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co., 470 U.S. 451, 466 105 S. Ct. 1441, 1452, 84 L. Ed. 2d 432 (1985).  That is because "the principal function of the legislature is not to make contracts, but to make laws that establish the policy of the state"; after all, "[p]olicies, unlike contracts, are inherently subject to revision and repeal."  Id. at 466, 105 S. Ct. at 1451.  Unless the legislature evinces an "unmistakable" intent to be contractually bound, United States v. Winstar, 518 U.S. 839, 860, 116 S. Ct. 2432, 2448, 135 L. Ed. 2d 964 (1996) (plurality opinion), we presume "that statutory enactments do not create contractual obligations," McGrath v. R.I. Retirement Bd., 88 F.3d 12, 19 (1st Cir. 1996); see also Winstar, 518 U.S. at 921, 116 S. Ct. at 2477 (Scalia, J., concurring) ("Governments do not ordinarily agree to curtail their sovereign or legislative powers, and contracts must be interpreted in a commonsense way against that background understanding.").

19

Here, the ERS—a public pension plan—can be fairly characterized as "part of the compensation package that [the City] dangle[s] to attract and retain qualified employees." See McGrath, 88 F.3d at 17. Pensions are thus "regarded as a species of unilateral contracts." Id.; see Bd. of Trs. of the Policemen's & Firemen's Ret. Fund v. Cary, 373 So. 2d 841, 842 (Ala. 1979) (per curiam) ("We analogize [a public pension program] to a unilateral contract . . . ."). That is, "the promise of a pension constitutes an offer which, upon performance of the required service by the employee[,] becomes a binding obligation." McGrath, 88 F.3d at 17 (alteration in original) (quoting Hoefel v. Atlas Tack Corp., 581 F.2d 1, 4 (1st Cir. 1978)).

The Alabama Supreme Court has made clear that once employees "have served and retired, the benefits to which they are entitled may not be reduced subsequent to their retirement absent an express reservation of a right to amend at any time." Cary, 373 So. 2d at 842. In the State of Alabama, then, contractual rights to retirement benefits accrue when employees have fulfilled their end of the bargain. For firefighters, this means performing ten years of creditable service and upon their reaching the age of retirement, or, alternatively, performing twenty-five years of creditable service, regardless of their age. See Ala. Code § 36-27-16(a)(1). Until that time, however, employees' interests in the retirement plan are "subject to legislative modification." Cary, 373 So. 2d at 843.

20

Plaintiffs argue that Gadsden firefighters who have complied with the statutory requirements possess a "vested" right to a 6% employee contribution rate. This argument relies on the assumption that there exists an implied promise not to raise the employee contribution rate once a firefighter becomes eligible for retirement benefits. We can find neither hide nor hair of such a promise.

To begin, nothing in the text of Alabama Code § 36-27 suggests that the employee contribution rate is immune from change, even after an employee's retirement benefits have vested. Employee contribution rates, moreover, were amended several times before plaintiffs joined the ERS. And it is well established that "the pervasiveness of . . . prior regulation in [an] area suggests that[,] absent some affirmative indication to the contrary," the most recent modification will not necessarily be the last. Nat'l R.R. Passenger Corp., 470 U.S. at 469, 105 S. Ct. at 1453. Indeed, by our count, the contribution rate for various classes of ERS participants has been amended at least six times over the course of several decades. See supra part I.A. When deciding whether to join the ERS, the former PFRF members were on notice of these prior increases, including an increase only one year before, which applied specifically to firefighters. Plaintiffs also had access to the 2002 ERS employee handbook when choosing whether to accept Gadsden's offer to change the terms of their pension. This handbook explicitly stated that the "member contribution rate is determined by statute and subject to change by the

21

Alabama Legislature." Doc. 50-27, at 9. Taken together, this evidence indicates that whatever contractual terms preside over the employment relationship between the City and its firefighters, a promise to refrain from raising contribution rates is not one of them.

Plaintiffs challenge this conclusion by pointing to Alabama Supreme Court precedent holding that pension benefits, once vested, cannot be reduced by subsequent legislation. Br. of Appellant at 29–32. Their reliance on this line of precedent is misplaced. Nothing in the reasoning of these cases suggests that every pension provision is rendered immutable once an employee becomes eligible to retire. To the contrary, the Alabama Supreme Court has selectively extended such protection only to benefits promised by the employer for which the employee has satisfied all the conditions precedent. See, e.g., Cary, 373 So. 2d at 842 ("[W]here the promissee has completely performed all of the obligations and all conditions precedent . . . the promisor has an unqualified duty to pay those obligations."); Snow v. Abernathy, 331 So. 2d 626, 631 (Ala. 1976) ("Snow's contractually vested right was to receive all benefits 'contracted' for . . . . By electing, expressly or by assent, to participate in such plan employees acquire vested rights of contract to the benefits provided therein upon acceptance of the plan."); Smith v. City of Dothan, 279 Ala. 571, 576, 188 So. 2d 532, 536 (Ala. 1966) (per curiam) ("[U]pon reaching eligibility for retirement . . . [the employee] acquired a vested right to the

22

benefits provided by [the pension program] free of the amendatory effect of [subsequent legislation].").

Here, the City did not alter plaintiffs' pension benefits; instead, it altered their pension obligations. This distinction—between pension benefits and pension obligations—is warranted by the well-worn difference between earned and anticipated compensation under the Contract Clause. Earned compensation is contractually protected: for example, if a public employee renders services "under a law specifying his compensation," he acquires a contractual right to be paid the amount promised. Mississippi ex. rel. Robertson v. Miller, 276 U.S. 174, 179, 48 S. Ct. 266, 268, 72 L. Ed. 517 (1928). Anticipated compensation, by contrast, does not receive the same protection; before a public employee renders services, the amount of promised compensation can be freely amended. See Dodge v. Bd. of Educ., 302 U.S. 74, 78–79, 58 S. Ct. 98, 100, 82 L. Ed. 57 (1937) ("[A]n act merely fixing salaries of officers creates no contract in their favor, and the compensation named may be altered at the will of the Legislature." (footnote omitted)). Nothing in the challenged legislation divests plaintiffs of their earned pension benefits. Instead, the increased contribution rate simply reduces plaintiffs' anticipated compensation by deducting an additional 2.5% from their future take-

23

home pay.[34]  See City of Birmingham v. Penuel, 242 Ala. 167, 174, 5 So. 2d 723, 728 (Ala. 1942) ("[T]he legislature may, without impairing the obligation of contract, reduce the compensation of an official . . . ."); cf. San Diego Police v. San Diego Ret. Sys., 568 F.3d 725, 738 (9th Cir. 2009) ("[I]ndirect effects on pension entitlements do not convert an otherwise unvested benefit into one that is constitutionally protected.").

In sum, plaintiffs have no contractual right to a static, inviolable 6% contribution rate.  The City was free to amend the employee contribution rate without constitutional consequence.

2.

Even assuming the existence of a contractual provision not to raise the employee contribution rate, plaintiffs still cannot succeed on their Contract Clause challenge because—at most—the City has breached a contract, not impaired one. Determining whether legislative action qualifies as a breach of contract or an impairment of contract "depends on the availability of a remedy in damages." E&E Hauling, Inc. v. Forest Preserve Dist. of Du Page Cnty., Ill., 613 F.2d 675, 679 (7th Cir. 1980) (citing Hays v. Port of Seattle, 251 U.S. 233, 237, 40 S. Ct.

---

[34] That is not to say that the City could automatically reduce the plaintiffs' compensation to zero.  A City firefighter cannot be "removed, discharged, or demoted, except for cause, upon written charges or complaint and after an opportunity to face his or her accusers and be heard in his or her own defense."  Ala. Code § 45-28A-42.11.

24

125, 64 L. Ed. 243 (1920)).  In other words, we must distinguish "between a measure that leaves the promisee with a remedy in damages for breach of contract and one that extinguishes the remedy."  Horwitz-Matthews, Inc. v. City of Chicago, 78 F.3d 1248, 1250 (7th Cir. 1996).  This formulation means that "where a city breaches a contract without a state legislative mandate as a defense, nothing generally prevents or excuses the city from performing its obligations, and thus the city will be liable for damages."  Crosby v. City of Gastonia, 682 F. Supp. 2d 537, 543–44 (W.D.N.C. 2010).

Of course, there is no legislative mandate to speak of in this case.  The local option is just that—an option.  The State has not passed legislation "that would prevent a local government from fulfilling its obligations under a contract [such that] . . . the breaching local government is prevented by state law from performing."  Id. at 543.  Because no state action has denied plaintiffs the possibility of a damages remedy, "it would be absurd to turn [the] breach of contract . . . into a violation of the federal Constitution."  Horwitz-Matthews, 78 F.3d at 1250.

## IV.

Plaintiffs have failed to demonstrate that the City of Gadsden impaired their contractual rights in this case.  Accordingly, the judgment of the District Court is

AFFIRMED.

25