CATTANI, J.,
concurring.
¶45 I concur in the court’s analysis, but I write separately to express my view that the superior court correctly ruled that Senate Bill 1609’s change to the Class Members’ contribution rate violates the Pension Clause of the Arizona Constitution. From my perspective, changing the employees’ pension contribution rate specified by statute—and thereby decreasing the employer’s funding share—diminished the employee’s public retirement system benefit. And because the Pension Clause provides that “public retirement system benefits shall not be diminished or impaired,” Ariz. Const, art. 29, § 1(C), the Bill is unconstitutional regardless whether it would survive scrutiny under the Contract Clause, and the remand urged by the dissent is unnecessary.
¶46 The defined benefit pension system to which Class Members belong guarantees each Class Member fixed monthly benefit payments from the time of retirement for the remainder of the retiree’s life. The cost of funding the post-retirement benefit payments is shared by Class Members and the State, with Class Members paying a fixed percentage of their salary at the rate specified in A.R.S. § 38-810, and the State responsible for the balance necessary (beyond investment earnings) to ensure the actuarial soundness of the pension system.
¶47 EORP and the State, as well as the dissent, posit that the Bill did not diminish or impair Class Members’ pension benefits because the Bill did not change the guaranteed monthly payments to which Class Members are entitled upon retirement. But under that view, the Legislature could unilaterally increase the employees’ contribution rate to the point that Class Members shoulder the entire cost of funding the public pension system rather than sharing the cost between employee and employer. And it would be nonsensical to suggest that converting a public employee’s employer-provided retirement benefit into an entirely self-funded retirement plan would not diminish the employee’s “public retirement system benefits.”
¶48 The same logic applies to a partial reduction in the employer’s share of contributions to a retirement plan. Consider, for example, an employment agreement in which an employer agreed to share in the cost of a $1,000,000 retirement annuity (to be purchased on the date of retirement) that would pay the employee $5,000 per month for the rest of the employee’s life. If the employer agreed to pay 60 percent ($600,000) of the cost to fund the annuity, with the employee responsible for the remaining 40 percent ($400,000), the value of the retirement benefit provided by the employer would be $600,000 as of the date of retirement. Under that scenario, increasing the employee’s share to 50 percent and reducing the employer’s contribution to 50 percent would mean that the value of the retirement benefit provided by the employer would only be $500,000, which would obviously be a reduction in that benefit.[6]
¶49 This example highlights that the benefit to an employee participating in a pension plan should not be measured—as the dissent suggests—as simply the sum of the retirement payments received during a retiree’s lifetime. Rather, the value of the benefit to the employee is the amount the employer contributes to guarantee the stream of post-retirement payments. And when the employee’s contribution rate is a factor in determining the amount of the employer’s contribution, the employee’s contribution rate is a *48 protected benefit under the Pension Clause.[7] Cf. Fields v. Elected Officials’ Ret. Plan, 234 Ariz. 214, 219-20, ¶¶ 24-29, 320 P.3d 1160 (2014) (holding that the statutory formula for determining retiree benefit increases constitutes a pension benefit for purposes of the Pension Clause). Thus, a unilateral increase in the employee’s contribution rate violates the Pension Clause.
¶50 The dissent relies on Taylor v. City of Gadsden, 767 F.3d 1124 (11th Cir. 2014), and Borders v. City of Atlanta, 298 Ga. 188, 779 S.E.2d 279, 281 (2015), to suggest that courts in other jurisdictions have concluded that pension contribution rates are not a “benefit.” But the analysis in those cases is based on a critical distinction: in both Taylor and Borders, the terms of the pension plan from the outset expressly allowed modification. Taylor involved a pension system in which the employee handbook “explicitly stated that the ‘member contribution rate is determined by statute and subject to change by the Alabama Legislature.’ ” 767 F.3d at 1129. The retirement plan at issue in Borders “unambiguously provide[d] for subsequent modification or amendment.” 779 S.E.2d at 282. The Pension Clause is only implicated when a promised benefit is “diminished or impaired,” and modifying the contribution rate in those circumstances did not take away a promised pension benefit precisely because the employment contract authorized the modification.
¶51 There is no such modification provision applicable to Class Members in this case. Section 38-810 specified a fixed 7% employee contribution rate, and no representations were ever made to Class Members that their contribution rate could vary in any way. Had Class Members been advised at the outset of their employment that their contribution rate was subject to change by the Legislature (effectively setting a variable formula for employee and employer contribution rates), Class Members—like the employees in Taylor and Borders—would not have a claim under the Pension Clause that a promised benefit was taken away.
¶52 And therein lies the problem underlying the position taken by EORP and the State, as well as the dissent, because the analysis turns on the question of what pension benefits employees were promised when they were hired. At its core, this case is based on the simple premise that employees who accept employment are entitled to rely on promises made as part of their employment contract. And when those promises involve pension benefits for state employees, that guarantee carries constitutional weight. Here, because Class Members were promised a specified (fixed) pension contribution rate as part of their initial employment contract, the Bill’s changes to that rate diminished a promised benefit and thus contravened the Pension Clause.
¶53 The dissent asserts that the employee contribution rate was in fact variable, and that the Bill thus did not result in a Pension Clause violation. Although the constitutional provision regarding public retirement systems contemplates that total contributions will vary as necessary to ensure actuarial soundness, see Ariz. Const, art. 29, § 1(A), the provision says nothing about the employees’ and employer’s relative share of the total contribution amounts. And nothing in the language of § 38-810 or the terms of employment under which Class Members were hired suggests a variable rate.[8] Rather, § 38-810 (as it existed when each of the Class Mem *49 bers was hired) specified an employee contribution rate of 7% of salary, and this became a provision of the employment contract on which each Class Member was entitled to rely.
¶54 The dissent notes that § 38-810 “has never contained language indicating an expectation or guarantee.” But the language of the statute creates precisely that expectation by imposing a fixed contribution rate for Class Members. And that language is in stark contrast to statutory language the Legislature has used in establishing other pension plans—such as ASRS—that impose a variable employee contribution rate. See A.R.S. § 38-736 (specifying that ASRS “member contributions are a percentage of a member’s compensation equal to the employer contribution”).[9]
¶55 The Legislature could have similarly designed EORP from the outset with a variable employee contribution rate. But it is not our role to rewrite the original statute or adopt language from other statutes. See Hughes v. Jorgenson, 203 Ariz. 71, 73, ¶ 11, 50 P.3d 821 (2002) (noting presumption that “the legislature has said what it means”); see also Comm. for Pres. of Established Neighborhoods v. Riffel, 213 Ariz. 247, 249-50, ¶ 8, 141 P.3d 422 (App. 2006) (noting that “when the legislature uses different language within a statutory scheme, it does so with the intent of ascribing different meanings and consequences to that language”).
¶56 Finally, the dissent misses the mark by suggesting that this case “freez[es] employee contribution rates in perpetuity.” Nothing in the court’s opinion prevents the State from prospectively specifying—as part of an initial employment contract—that a defined-benefit employee is subject to a variable contribution rate or, as the State has actually done for judges appointed after the effective date of the Bill, provide new employees with a defined contribution pension plan. Moreover, although the dissent references pension systems involving other types of state employees while highlighting the economic concerns underlying pension reform proposals, the court’s decision addresses only a small percentage of state employees (judges) who are part of an independent branch of government and whose positions carry added constitutional protections. See Ariz. Const, art. 6, § 33 (providing that the Legislature cannot remove judges from office or reduce their salary). And although the State cannot fire judges or reduce their salaries, nothing prevents the State from negotiating a change to the contribution rate for judges and incentivizing such a change by, for example, conditioning future raises on an agreement to accept a higher contribution rate. Accordingly, the court’s decision does not “lock in” an unworkable contribution rate in perpetuity, and instead simply requires that changes to promised pension benefits be carried out in a manner that comports with constitutional principles.

. The dissent asserts that a guaranteed annuity as of the date of retirement is not an accurate way to portray Class Members’ retirement benefits because "in reality, under EORP, the payments are made and calculated during employment, based not only on that particular employee's circumstances but the pension system as a whole.” But while calculating the funding needed for the public retirement system admittedly requires a more complex actuarial model than this illustration, the shared funding obligations and fixed post-retirement payments of this guaranteed annuity example are in fact similar to the relevant provisions of the Class Members’ defined benefit pension.

. The retirement payment amount is similarly protected under the Pension Clause. Assuming (as § 38-810 specified) a fixed employee contribution rate, a reduction in the post-retirement payment obligation would reduce the employer’s funding share, thus diminishing the employee's pension benefit in violation of the Pension Clause.

. The dissent asserts that the employee contribution rate specified by § 38-810 "has varied over time,” and that the rate "has changed multiple times over the years.” In fact, the rate was changed only once: an increase from 6% to 7% in 1987, shortly after EORP was created. A single statutory modification almost three decades ago—and over a decade before adoption of the Pension Clause—does not establish that the rate is variable at the Legislature’s will, much less that such modification comports with the strictures of the Pension Clause. Nor does it foreclose the argument—not at issue here—that an employee hired with the promise of a 6% contribution rate would be entitled to that rate notwithstanding the statutory change.

. This means that for ASRS members, who as the dissent acknowledges make up the overwhelming majority of state employees (approximately 535,-000 of 582,000), the contribution rate is not fixed as a specified percentage of the employee’s salaty, but—consistent with the statutoiy terms of the employment contract—can increase or decrease (just as the State’s rate can correspondingly go up or down) depending on the amount needed to fund the overall ASRS pension fund.