IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

————————

**THE HONORABLE PHILIP HALL ET AL.,**
*Plaintiffs/Appellees/Cross-Appellants,*

*v.*

**ELECTED OFFICIALS' RETIREMENT PLAN ET AL.,**
*Defendants/Appellants/Cross-Appellees,*

**STATE OF ARIZONA,**
*Intervenor-Defendant/Appellant/Cross-Appellee.*

————————

No. CV-15-0180-T/AP

Filed November 10, 2016

————————

Appeal from the Superior Court in Maricopa County
The Honorable Randall H. Warner, Judge
No. CV2011-021234
**AFFIRMED IN PART AND REVERSED IN PART**

————————

COUNSEL:

Ron Kilgard (argued), Alison E. Chase, Keller Rohrback, L.L.P., Phoenix, Attorneys for Philip Hall and Jon W. Thompson et al.

Bennett Evan Cooper, Steptoe & Johnson, LLP, Phoenix, Attorney for Elected Officials' Retirement Plan and the Members of the Board of Trustees of the Public Safety Personnel Retirement System

Mark Brnovich, Arizona Attorney General, Charles A. Grube (argued), Senior Agency Counsel, Phoenix, Attorneys for State of Arizona

Colin F. Campbell, Osborn Maledon, PA, Phoenix; and Robert D. Klausner, Adam P. Levinson, Klausner Kaufman Jensen & Levinson, Plantation, FL, Attorneys for Amicus Curiae National Conference on Public Employee Retirement Systems

————————

JUDGE HOWE[*] authored the opinion of the Court, in which JUDGE BUTLER[*] joined, JUDGE CATTANI[*] joined and specially concurred, and JUSTICE BOLICK and JUDGE TREBESCH[*] dissented in part and concurred in the judgment in part.

JUDGE HOWE, opinion of the Court:

¶1 In 2011, the Arizona Legislature enacted Senate Bill 1609, which made certain changes to the Elected Officials' Retirement Plan. The Bill changed the formula for calculating future benefit increases for retired Plan members and increased the amount that employed Plan members must contribute toward their pensions. Retired members of the Plan challenged the provision changing the formula for calculating future benefit increases. They argued that the change violated the Pension Clause of the Arizona Constitution, article 29, section 1, which provides that "public system retirement benefits shall not be diminished or impaired."[1]

_____

[*] Chief Justice Scott Bales, Vice Chief Justice John Pelander, and Justices Robert M. Brutinel and Ann A. Scott Timmer recused themselves; pursuant to article 6, section 3 of the Arizona Constitution, the Honorable Randall M. Howe and the Honorable Kent E. Cattani, Judges of the Court of Appeals, Division One; the Honorable Michael J. Butler, Judge of the Pima County Superior Court; and the Honorable Patricia A. Trebesch, Judge of the Yavapai County Superior Court, were designated to sit in this matter.

[1] This provision was subsequently amended by Laws 2016, S.C.R. 1019, § 1, effective May 26, 2016. This amendment pertains only to the

We agreed, holding that this provision was unconstitutional as applied to the Plan's retired members. *See Fields v. Elected Officials' Ret. Plan*, 234 Ariz. 214, 320 P.3d 1160 (2014).

¶2        Employed members of the Plan also challenged the Bill. First, they argued that the unilateral changes to the benefit increases formula and to the amount they were required to contribute toward their pensions violated the Pension Clause for the reasons set forth in *Fields*. Second, relying on our long-standing decision in *Yeazell v. Copins*, 98 Ariz. 109, 402 P.2d 541 (1965), they argued that because their pensions were part of their employment contracts that vested when they began employment, the Legislature could not unilaterally change the terms of their pensions to their detriment. The trial court granted the employed members summary judgment, invalidating the provisions at issue. The court denied the members' request for attorneys' fees and prejudgment interest, however. The court also denied the members' request to have the judgment run against the State, which had intervened in the case. EORP and the State appealed and the members cross-appealed.

¶3        Upon transfer from the court of appeals, we affirm the granting of summary judgment to the employed Plan members. As we held in *Fields*, the Bill's change to the benefit increases formula violates the Pension Clause because it "diminishes and impairs" the employed members' pension benefits. The Bill's changes to the benefit increases formula and the contribution rate also violate our holding in *Yeazell* because the Legislature cannot unilaterally change the terms of the members' pension contracts once their rights to those terms have vested at the beginning of the members' employment. Contrary to the trial court's ruling, however, we find that the employed members are entitled to attorneys' fees and prejudgment interest and that the judgment must run against the State as well as the Plan.

## I.    FACTS AND PROCEDURAL HISTORY

¶4        In 1985, the Legislature established the Plan to provide pension benefits for elected officials, including judges. A.R.S. §§ 38–801(15),

---

Public Safety Personnel Retirement System established by Chapter 38, Article 4.1, and thus does not affect the resolution of this case.

–802, –804.  The Plan has four funding sources: employer contributions, employee contributions, court filing fees, and investment proceeds.  A.R.S. § 38–810.  The employee contribution rate was set by statute initially at 6%, with the employer being responsible for contributing the remaining amount necessary to fund a defined benefit upon retirement.  *See* A.R.S. § 38–810(A) (1985).  In 1987, A.R.S. § 38–810(A) was amended to increase the employees' contribution to 7%.  *See* 1987 Ariz. Legis. Serv., ch. 146, § 4, *codified at* A.R.S. § 38–810(A) (1987).

¶5        During the 1990s, the Plan generated investment returns that far exceeded the actuarially assumed rate of return.  *See PSPRS Plan's Funding Status Report with Options for Improving Funding and Reducing Required Contributions*, at 2 (2010).  During the same period, however, the Plan's financial health was being "seriously compromised" because the Plan was gradually concentrating its investments in securities of high technology and telecommunications companies.  *Id.*  In March 2000, the prices of technology and telecommunications securities began to "decline rapidly."  *Id.*  This made the Plan vulnerable to major financial shocks in 2000, 2008, and 2009.  By fiscal year 2011, the Plan's funding ratio—the actuarial value of the Plan's assets divided by its actuarial accrued liabilities—was 62.1%, a drop from 121% in 1998 and 101.9% in 1985.  Accordingly, the State's contribution level necessarily increased, while the employee contribution rate remained constant, as set by statute.

¶6        In 2011, attempting to address continued rising costs, the Legislature enacted the Bill, making several unilateral changes to the Plan to be applied retroactively from June 30, 2011.  *See* 2011 Ariz. Legis. Serv., ch. 357.  One change the Bill made was to the statutory formula for calculating permanent benefit increases under A.R.S. § 38–818.  The Bill amended A.R.S. § 38–818.01 to prohibit the transfer of any investment earnings that exceed the rate of return to the reserve fund and changed the formula used to calculate the permanent benefit increases, increasing the rate of return necessary to trigger a benefit increase.  *See* A.R.S. § 38–818.01(B).

¶7        We resolved whether the Bill's change to the statutory formula for calculating permanent benefit increases was constitutional with respect to retired members in *Fields*, 234 Ariz. at 221 ¶ 34, 320 P.3d at 1167.  We held that the formula was a "benefit" for purposes of the Pension Clause and that the Bill's change to the formula violated the clause because it

diminished and impaired the retired members' retirement benefits. *Id.* at 220–21 ¶¶ 29, 34, 320 P.3d at 1166–67. Because the Bill retroactively prevented the transfer of funds to the Plan's reserve, the Plan could not fund expected benefit increases, and retired members' benefit increases consequently were reduced or eliminated in 2011, 2012, and 2013. *Id.* at 221 ¶ 35, 320 P.3d at 1167. The Bill also made it less likely that retired members would receive future benefits increases because of the raised rate of return required to fund an increase. *Id.* at ¶ 36, 320 P.3d at 1167.

¶8          The Bill made another change that was not at issue in *Fields*, but is here. The Bill amended the employee contribution rate structure by increasing the rate to 10% for fiscal year 2011–2012 and to 11.5% for fiscal year 2012–2013. A.R.S. § 38–810(F)(1)–(3) (2011). It also set the rate for fiscal year 2013–2014 and each fiscal year thereafter to the lesser of 13% of the member's gross salary or 33.3% of the sum of the member's contribution rate from the preceding fiscal year and the normal cost plus the actuarially-determined amount required to amortize the employer's unfunded accrued liability. A.R.S. § 38–810(F)(4) (2011).

¶9          In November 2011, Judges Philip Hall—who has since retired—and Jon W. Thompson, on behalf of themselves and as representatives of a class of employed Plan members and beneficiaries as of July 20, 2011, the Bill's effective date (collectively, "Class Members"), sued the Plan and the Board of Trustees of the Public Safety Personnel Retirement System (collectively, "EORP"). The Class Members alleged that the Bill violated *Yeazell*, the Pension and Judicial Salary Clauses of the Arizona Constitution, and the Contract Clauses of the Arizona and United States Constitutions. The State intervened to defend the Bill. After the State intervened, the Class Members notified the trial court and the parties that they would seek relief, including attorneys' fees, expenses, and taxable costs, not only from EORP but also from the State.

¶10          After intervening litigation, the parties each moved for summary judgment. The Class Members maintained—as relevant here—that the Bill violated *Yeazell* by unilaterally modifying their interests in their pensions, which had vested at the outset of their employment with the State, and violated the Pension Clause by diminishing their entitled benefits. EORP and the State responded that the Class Members' rights had not yet vested and therefore the Legislature could modify the pension plan as it saw fit. EORP and the State noted that in 2000, the Legislature had

enacted A.R.S. § 38–810.02 ("the vesting statute"), providing that EORP benefits vest at the time the employee applies for benefits or retires. EORP and the State argued that because the statute applies retroactively, it has become part of the Class Members' employment contracts with the State, and accordingly, their rights do not vest until they retire.

¶11　　　The trial court granted the Class Members' motion for summary judgment and denied EORP's and the State's cross-motions for summary judgment. The court held that the Pension Clause protected the benefit increases formula and the 7% prior contribution rate because they constituted "benefits" that were always part of the members' contractual relationship with the State. The court rejected EORP's argument that the vesting statute preempted the members' contractual rights and their rights under the Pension Clause. The court concluded that the statute applies only to "ordinary" vesting, meaning that a member has no right to receive retirement benefits until the member fulfills specific conditions and retires. The court thus granted the Class Members the relief they sought.

¶12　　　The parties then asked for a stay pending our decision in *Fields*, which the trial court granted. After considering the effect of *Fields,* the court denied the Class Members' request for attorneys' fees under A.R.S. § 12–341.01 because it concluded that the action arose out of constitutional and statutory—not contractual—obligations. The court also denied the Class Members' request for prejudgment interest because it found that EORP was not unjustly enriched and should not be charged interest on money it legally could not pay. The court further denied the Class Members' request that relief run against the State because it found that the State had intervened only to defend the Bill's constitutionality and the Class Members' notice seeking relief against EORP and the State was insufficient to assert claims against the State.

¶13　　　EORP and the State timely appealed the summary judgment in the Class Members' favor, and the Class Members timely cross-appealed the judgment denying attorneys' fees, prejudgment interest, and relief against the State. We granted the parties' joint petition to transfer the case under Arizona Rule of Civil Appellate Procedure 19(a). The funding of public pensions raises issues of statewide importance, and we have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution.

## II.    DISCUSSION

### ISSUES ON APPEAL

**¶14**        EORP and the State argue that the trial court erred by finding that the Bill violates the Pension Clause and *Yeazell*.[2]  We review de novo the constitutionality of statutes and, if possible, construe them to uphold their constitutionality.  *State v. Glassel*, 211 Ariz. 33, 51 ¶ 65, 116 P.3d 1193, 1211 (2005).  We presume that a statute is constitutional, and the "party asserting its unconstitutionality bears the burden of overcoming the presumption."[3]  *Eastin v. Broomfield*, 116 Ariz. 576, 580, 570 P.2d 744, 748 (1977).  As discussed below, we hold that (1) the Bill's change to the benefit increases formula provision violates the Pension Clause by diminishing and impairing a benefit to which the Class Members are entitled and (2) its changes to the benefit increases formula and the contribution rate provisions are unconstitutional under *Yeazell* because it unilaterally modified the Class Members' employment contracts with the State to the Class Members' detriment.

### A.    The Pension Clause

**¶15**        EORP and the State first argue that the trial court erred because the benefit increases formula and the prior contribution rate are not

[2]        The Class Members argue that even if the Bill does not violate the Pension Clause and *Yeazell*, it is still unconstitutional under the Contract Clauses of the United States and Arizona Constitutions and the Judicial Salary Clause of the Arizona Constitution.  *See* Ariz. Const. art. 6, § 33; Ariz. Const. art. 2, § 25; U.S. Const. art. 1, § 10.  We need not reach these arguments, however, because the Pension Clause and *Yeazell* resolve the fundamental issues regarding the Class Members' rights to the benefit increases formula and the prior contribution rate.

[3]        The Class Members argue that because *Fields* held that the Bill's benefit increases formula provision was unconstitutional, the Bill is not entitled to such a presumption.  But *Fields* decided only the Bill's constitutionality with regard to *retired* judges and their entitlement to the benefit increases formula. 234 Ariz. at 220–21 ¶¶ 29, 34, 320 P.3d at 1166–67. The issue here is its constitutionality with regard to *employed* judges and their entitlement to the benefit increases formula and the prior contribution rate.

"benefits" and therefore not protected by the Pension Clause. Regarding the benefit increases formula, this Court concluded in *Fields* that permanent benefit increases and the benefit increases formula were "benefits" as used in the Pension Clause. *See* 234 Ariz. at 219, 220 ¶¶ 23, 26, 320 P.3d at 1165, 1166. The reasoning in *Fields* applies with equal force to the Class Members because the Bill's change to A.R.S. § 38–818's formula diminishes and impairs the Class Members' retirement benefits just as it does for retired members. *See id.* at 221–22 ¶¶ 34–36, 320 P.3d at 1167–68. The Bill's amendment regarding the benefit increases formula therefore violates article 29, section 1(C), of the Arizona Constitution. Regarding the prior contribution rate, however, because we hold that the prior contribution rate is protected under *Yeazell*, *see infra* § B, we need not decide whether it is also protected under the Pension Clause. *See Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g, P.C.*, 467 U.S. 138, 157 (1984) ("It is a fundamental rule of judicial restraint . . . that this Court will not reach constitutional questions in advance of the necessity of deciding them.").

### B. A Binding Contractual Relationship

#### 1. *Yeazell v. Copins*

¶16　　　EORP and the State also argue that the trial court erred in applying *Yeazell* because "*Yeazell* enshrined the vesting statute as part of the [member's employment] contract, authorizing the Legislature *as a matter of the express contract* to make reasonable prospective changes like adjusting the contribution rate." Consequently, they argue, *Yeazell* does not "apply constitutional protections for pension rights" and also does not affect whether the Pension Clause protects the benefit increases formula and the prior contribution rate. The Class Members counter that the Bill violates *Yeazell* because it seeks to unilaterally and retroactively modify their pension terms as provided in their employment contracts when they began services.

¶17　　　*Yeazell* established that the State's promise to pay retirement benefits is part of its contract with the employee. *See* 98 Ariz. at 113–17, 402 P.2d at 544–47. By accepting a job and continuing to work, the employee has accepted the State's offer of retirement benefits, and the State may not impair or abrogate the terms of that contract without obtaining the employee's consent. *Id. Yeazell* involved a Tucson police officer's appeal of a local board's decision setting his pension benefits based on a 1952 amendment to the pension statute in effect at the time of his retirement,

rather than on the statute in effect when he was hired in 1937. *Id.* at 111, 402 P.2d at 542. Yeazell argued that the 1937 statute, requiring him to contribute 2% of his salary and granting him a monthly pension equal to one-half of his average monthly compensation for one year immediately before his retirement date, was the applicable law from which to determine his retirement benefits—not the 1952 statute. *Id.* His benefit under the 1937 statute would have been $7.21 more per month than his benefit under the 1952 statute. *Id.*

**¶18** The issue in *Yeazell* was whether the Legislature could unilaterally change statutorily-created retirement benefits that were part of the terms of an employee's employment contract when the employee began service. *See id.* at 111–12, 402 P.2d at 542–43. The majority rule in the United States at the time was that pensions—characterized as "gratuities" granted at the sovereign's benevolent will—could be modified because the employees had no vested right to them. *Id.* at 112, 402 P.2d at 543. Thus, pension plans could be amended or changed as a legislature saw fit. *Id.* *Yeazell* recognized, however, that treating retirement benefits as "gratuities" posed a problem in Arizona because of the state's Gift Clause, *id.* at 112, 402 P.2d at 543, which, as relevant here, prohibits state entities from giving or lending its credit "in the aid of, or mak[ing] any donation or grant, by subsidy or otherwise" to any individual, Ariz. Const. art. 9, § 7.

**¶19** *Yeazell* acknowledged that under the Gift Clause, "[t]he state may not give away public property or funds; it must receive a *quid pro quo* which, simply stated, means that it can enter into contracts for goods, materials, property and services." 98 Ariz. at 112, 402 P.2d at 543. Thus, to uphold Arizona retirement plans under the Arizona Constitution, this Court concluded that pensions were *not* gratuities, but were, in the nature of contracts, viewed as deferred compensation for services rendered. *Id.* at 113–15, 402 P.2d at 543–45. We reasoned that a pension is a gratuity only when it is granted for services previously rendered, but when the services are rendered under a pension statute, "the pension provisions become a part of the contemplated compensation for those services, and so in a sense a part of the contract of employment itself." *Id.* at 113, 402 P.2d at 544; *see also Proksa v. Ariz. State Sch. for the Deaf & the Blind*, 205 Ariz. 627, 631 ¶ 21, 74 P.3d 939, 943 (2003) ("Put differently, in the retirement benefits area, given the Gift Clause of our constitution, this court effectively found an 'adequate expression of an actual intent of the State to bind itself,' because

any finding to the contrary would render the statutes unconstitutional.") (citation omitted).

¶20        Based on *Yeazell* and its Gift Clause underpinnings, the law in Arizona has been clear since 1965 that public employees are contractually entitled to the retirement benefits specified in their initial employment contract. *See, e.g., Proksa*, 205 Ariz. at 630 ¶ 16, 74 P.3d at 942; *Norton v. Ariz. Dep't of Pub. Safety Local Ret. Bd.*, 150 Ariz. 303, 723 P.2d 652 (1986); *Thurston v. Judges' Ret. Plan*, 179 Ariz. 49, 876 P.2d 545 (1994). This protected relationship prevents the Legislature from changing the employee's pension terms at will after the terms have vested, *see Yeazell*, 98 Ariz. at 115– 16, 402 P.2d at 545–46, and provides public employees reasonable expectations that their retirement benefits are protected by the law of contracts, *see id.* at 117, 402 P.2d at 546 (holding that a public employee "ha[s] the right to rely on the terms of the legislative enactment of the [pension plan] as it existed at the time he entered the service," and that "subsequent legislation may not be arbitrarily applied retroactively to impair the contract"). The parties may subsequently agree to modify the contract, of course, but the State may not unilaterally change the contractual terms unless the change benefits the employee. *See Thurston*, 179 Ariz. at 51, 876 P.2d at 547 (recognizing that "when the amendment [to retirement benefits] is beneficial to the employee or survivors, it automatically becomes part of the contract by reason of the presumption of acceptance"). Under that circumstance, the employee is deemed to have ratified the beneficial change, which becomes part of the employment contract. *Id.*

¶21        For Yeazell, we concluded that the Legislature had unilaterally amended the 1937 statute, which had become a part of his employment contract—a contract that included the 2% contribution rate and a pension calculation based on his last year's earnings. Tucson therefore could not retroactively vary the pension terms without Yeazell's consent. *Yeazell*, 98 Ariz. at 116, 402 P.2d at 546. We explained that although an employee may not qualify to receive his pension benefits until he has performed the necessary condition—completion of the requisite years of service—this did not mean that from the moment Yeazell entered service as a Tucson police officer, a firm and binding contract did not exist between him and the City of Tucson. *Id.* at 114, 402 P.2d at 544.

¶22        Although acknowledging that *Yeazell* established a contractual relationship between the State and public employees regarding

the employees' pensions, EORP and the State nonetheless assert that *Yeazell* provides only that "the employees' *contractual relationship* vested at the time they began services [and] does not automatically mean that *specific benefits* vested at that time, without regard to the contemporaneous terms of the contract." But the specific benefits—that is, the terms of the legislative enactment relating to the employees' pensions as they existed when the employees began their services—are exactly the type of benefits *Yeazell* protects:

> The legislature amended the 1937 statute which was a part of appellant's contract of employment with the City of Tucson. Tucson now attempts to apply the changes retroactively to vary the terms of its contract with appellant. We hold the changes, if applied to appellant without his assent, would constitute an alteration, a modification of his contract. This Tucson may not do.

*Id.* at 116, 402 P.2d at 546. *Yeazell* thus protects the specific terms of a public pension contract from unilateral retroactive alteration. Even the dissent in *Yeazell* recognized this as the Court's holding. *See id.* at 118, 402 P.2d at 547 (Udall, J., dissenting) (stating that the majority's holding was based on the "erroneous premise that there was created upon employment an absolute binding 'contract' to a specific pension," which meant that the majority was holding that "the legislature, by subsequent enactment, can modify the original pension terms only if the employee consents").

¶23 The Bill's changes to the Class Members' pension contracts are consequently invalid under *Yeazell*. When the Class Members were elected or appointed as judges, they entered a contractual relationship with the State regarding the public retirement system of which they became members. Their retirement benefits were a valuable part of the consideration the State offered upon which the Class Members relied when accepting employment. *See Fields*, 234 Ariz. at 220 ¶ 27, 320 P.3d at 1166 ("As in *Yeazell*, Fields has a right in the existing formula by which his benefits are calculated as of the time he began employment and any beneficial modifications made during the course of his employment."). Under their contracts, the Class Members received retirement benefits as terms of their contracts for which they agreed to share the cost with their employers. Thus, an increase in the Class Members' proportionate share of the contribution rate above 7% and the change in the statutory formula

granting permanent benefit increases without the Class Members' consent are breaches of that contract and infringe upon the Class Members' contractual relationship with the State. *See Thurston*, 179 Ariz. at 52, 876 P.2d at 548 ("Where the modification is detrimental to the employee, it may not be applied absent the employee's express acceptance of the modification because it interferes with the employee's contractual rights."). By including in its scope Class Members who were Plan members at the time of enactment, the Bill retroactively, unilaterally, and substantially changed the contract terms that the parties previously agreed to. This violates *Yeazell*.

¶24        EORP and the dissent both argue that this is not the end of the analysis. They note that *Yeazell* commented that if a governmental entity shows that its pension plan is actuarially unsound, "the law governing mutual mistakes of fact" applies. *See* 98 Ariz. at 116, 402 P.2d at 546. They interpret this comment to mean that if EORP and the State could show that the parties to the Plan made a mistake about the Plan's financial viability, the Bill's retroactive changes would be permissible modifications of the Plan under *Yeazell*. But EORP and the dissent over-read *Yeazell*'s comment. Although this Court indeed said that the law of mistakes of fact applied to a pension plan if it was actuarially unsound, we expressly and carefully declined to address the consequences of such an application: "We do not, however, mean to imply what rights or remedies might be available to either party in a situation where it is established that a retirement plan is actuarially unsound. This is a matter beyond the issues of the present litigation." *Id.* at 117, 402 P.2d at 546.

¶25        This Court's reticence was appropriate. While the defense of mutual mistake of fact applies in any contract dispute, EORP and the State are unable to prove that defense as a matter of law. That defense requires that the party seeking to void a contract prove that (1) the parties made a mistake about a basic assumption on which they made the contract, (2) the mistake had a material effect on the exchange of performances, and (3) the party seeking avoidance does not bear the risk of the mistake. Restatement (Second) of Contracts § 152(1) (1981); *see also Renner v. Kehl*, 150 Ariz. 94, 97, 722 P.2d 262, 265 (1986) (applying § 152 in resolving claim of mutual mistake of fact). EORP and the State cannot prove two of these elements.

¶26        First, EORP and the State cannot show that the parties made a mistake about a basic assumption of the Plan. They claim (and the dissent

accepts, *see infra* ¶¶ 73, 104) that the mistake was the parties' shared assumption that the Plan was actuarially sound, meaning that the parties mistakenly believed that the Plan's investment returns would be sufficient to maintain the Plan's actuarial soundness without changing the benefit increases formula or the employee contribution rate. But disappointment about anticipated investment returns does not qualify as a mistake. *See* Restatement (Second) of Contracts § 152 cmt. b (noting that "market conditions and the financial situation of the parties are ordinarily not such assumptions," and "mistakes as to market conditions or financial ability do not justify avoidance under the rules governing mistake").[4] Moreover, the Plan's actuarial soundness is within the Legislature's control. The Legislature is responsible for setting the amounts of the employer contributions and court filing fees, *see* A.R.S. § 38–810(B)–(D), and the Legislature may not "reduce the amount of the contributions to the fund if thereby the soundness of the fund is jeopardized," *Yeazell*, 98 Ariz. at 116, 402 P.2d at 546. If the Plan is underfunded because of inadequate investment returns, the State may increase employer contributions and filing fees.

¶27        Second, even if unanticipated reductions in investment returns could qualify as a mistake, EORP and the State cannot show that the State did not bear the risk that this mistake might occur. The Legislature designed the Plan so that the State accepted the risk of variable investment returns. When investment returns are high, the State's funding obligation through employer contributions is reduced or eliminated, as happened from 1998 to 2001. But when investment returns are low, the State's funding obligation is necessarily increased. In either situation, however, the Class Members' contribution rate remains fixed. Thus, the Class Members are not permitted to obtain any cost savings from higher investment returns, but they likewise are not required to pay more because of lower investment

---

[4]        EORP also claims that changes to the Class Members' pension contracts may be justified under the defense of "commercial impracticability." As with the defense of mutual mistakes of fact, however, "mere market shifts or financial inability do not usually effect discharge under the rule" of commercial impracticability. Restatement (Second) of Contracts § 261 cmt. b; *accord id.* at § 152 cmt. b (recognizing that the same analysis applies for mutual mistakes of fact and commercial impracticability). Any defense of commercial impracticability thus fails.

returns. The reward and risk of investment returns falls on the State. This is simply the nature of defined benefit plans. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999) (stating that in a defined benefit plan "the employer typically bears the entire investment risk" and "must cover any underfunding as the result of a shortfall that may occur from the plan's investments"). Because the State bears the risk of the claimed mistake, the State cannot rely on the defense of mutual mistake of fact to justify changes to the Plan.[5]

---

[5] The dissent contends that in ruling that EORP and the State are unable to establish the defenses of mutual mistake of fact and commercial impracticability, we are usurping the trial court's role by improperly determining as fact that poor investment returns were the cause of the Plan's alleged actuarial unsoundness. *See infra* ¶¶ 104–106. The dissent maintains that EORP and the State "presented evidence of a variety of causes" and did not rely only on the Plan's poor investment returns. *Id.* This misunderstands the record and our ruling.

In the pleadings and arguments before the trial court, EORP and the State did not present a "variety of causes" for the Plan's alleged actuarial unsoundness; they presented two: the Plan's poor investment returns and the unsustainability of the former benefit increases formula. These are actually the same cause, however. The former benefit increases formula was based on the Plan's investment returns, *see* Laws 1998, ch. 264 § 1; *Fields*, 234 Ariz. at 216 ¶ 4, 320 P.3d at 1162, which is the very reason that EORP and the State allege it was unsustainable. Thus, the claimed mutual mistake of fact or commercial impracticability—whether made forthrightly on poor investment returns or obliquely on the unsustainability of the benefit increases formula—rests on investments returns. Because EORP and the State as a matter of law cannot rely on poor investment returns to support their defenses, *see* Restatement (Second) of Contracts § 152 cmt. b; *id.*, § 261 cmt. b, our ruling is not improperly based on any factual determination, *see Scottsdale Jaycees v. Super. Ct.*, 17 Ariz. App. 571, 574, 499 P.2d 185, 188 (1972) (holding that when the dispute is not with the facts but with "the legal conclusions to be drawn from" the facts, the legal conclusions "are properly resolved by the court sitting in its capacity as judge and not in its capacity as a trier of fact.").

¶28        The dissent also maintains that the Bill's changes to the Plan may be upheld under the Contract Clauses of the United States and Arizona Constitutions.  U.S. Const. art. 1, § 10; Ariz. Const. art. 2, § 25. *See infra* ¶ 107. As we have explained, however, the Bill's unilateral and retroactive changes to the vested terms of the Plan violate *Yeazell* and the Gift Clause. *See supra* at ¶¶ 19–23.  Consequently, analyzing whether the Bill would pass review under the Contract Clauses were it not for *Yeazell* and the Gift Clause is unnecessary and violates the principle of judicial restraint.  *See Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 453 (1985) (stating that judicial restraint requires "avoid[ing] unnecessary resolution of constitutional issues").

¶29        The dissent's substantive concerns about our holding are, respectfully, not well taken.  The dissent, however, raises one other concern that merits discussion.  The dissent discusses at great length the perilous state of the Plan and this Court's need to defer to the Legislature's policy choices in making the Plan solvent, *see infra* ¶¶ 58, 64–66, 108, effectively asking this Court to get out of the way and let the Legislature fix the problem.  This argument has been raised in other cases involving judicial pension reform, when state legislatures have run afoul of state constitutional provisions that preclude retroactive changes to judicial pensions.  *See In re Pension Reform Litig.*, 32 N.E.3d 1, 19–26 (Ill. 2015); *De Pascale v. State*, 47 A.3d 690, 693, 704–05 (N.J. 2012).

¶30        But this is not a matter of refusing to defer to the Legislature on an issue of public policy.  It is a matter of requiring the Legislature to follow the Arizona Constitution in setting that policy.  We recognize that the financial soundness of public pension systems is a matter of great public importance.  We acknowledge that devising measures to guarantee the Plan's financial stability is difficult and fraught with unpleasant policy choices.  But whatever measures the Legislature enacts to address the problem still must comport with the Arizona Constitution.  *See In re Pension Reform Litig.*, 32 N.E.3d at 19 (stating that "[n]either the legislature nor any executive or judicial officer may disregard the provisions of the constitution even in case of a great emergency") (citation omitted); *De Pascale*, 47 A.3d at 704 (noting that a legislature has the right to implement its policy choices in dealing with critical issues but that those choices "must be made within a constitutional framework").  In examining the Bill's constitutionality, we are not meddling in the Legislature's policy choices.  We are fulfilling our duty to ensure that the Arizona's constitutional framework is respected and

observed in making those choices. *See Pool v. Superior Court*, 139 Ariz. 98, 108, 677 P.2d 261, 271 (1984) (noting that interpreting the state constitution is this Court's responsibility). The provisions of the Bill at issue here are contrary to Arizona's constitutional framework and consequently invalid.

## 2.    The Vesting Statute

**¶31**         EORP and the State further assert that although *Yeazell* established a contractual relationship between the State and its employees regarding pensions, the vesting statute, enacted in 2000, is part of the employment contract for any employee hired after that date and allows the Legislature to modify the pension terms for members before they retire. The vesting statute provides:

> A.    Because the plan as enacted at a particular time is a unique amalgam of rights and obligations having a critical impact on the actuarial integrity of the plan, the legislature intends that the plan as enacted at a particular time be construed and applied as a coherent whole and without reference to any other provision of the plan in effect at a different time.

> B.    The plan was established in order to provide a uniform, consistent and equitable statewide program for those eligible elected officials as defined by the plan. A member of the plan does not have a vested right to benefits under the plan until the member files an application for benefits and is found eligible for those benefits. An eligible claimant's right to benefits vests on the date of the member's application for those benefits or the member's last day of employment under the plan, whichever occurs first.

A.R.S. § 38–810.02. This Court has previously stated that rights legally vest "when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest." *Hall v. A.N.R. Freight Sys., Inc.*, 149 Ariz. 130, 140, 717 P.2d 434, 444 (1986); *Thurston*, 179 Ariz. at 50–51, 876 P.2d at 546–47. "A vested property right is a right which is actually assertable as a legal cause of action or defense or is so substantially relied upon that retroactive divestiture would be manifestly unjust." *Aranda v. Indus. Comm'n of Ariz.*, 198 Ariz. 467, 471 ¶ 18, 11 P.3d 1006, 1010 (2000) (internal quotation marks and citation omitted).

Thus, once substantive rights have vested, they cannot be impaired. *Hall*, 149 Ariz. at 140, 717 P.2d at 444. And rights that are legally vested differ from rights that are contingently vested, that is, ones that only "come into existence on an event or condition which may not happen or be performed until such other event may prevent their vesting." *Thurston*, 179 Ariz. at 50, 876 P.2d at 546; *see also Fund Manager, Pub. Safety Pers. Ret. Sys. v. Phx. Police Dep't Pub. Safety Pers. Ret. Sys. Bd.*, 151 Ariz. 487, 490, 728 P.2d 1237, 1240 (App. 1986) (listing employment rights that do not vest until the "condition" of service is satisfied, including accidental disability pension, unearned annual leave, vacation credits, and sick leave).

¶32 EORP and the State argue that the term "vesting" as used in the statute refers to legal vesting and operates to permit a unilateral change to an employment contract. But if we were to accept their position, the vesting statute would alter earlier established substantive rights to particular retirement benefits, violating *Yeazell*. Thus, the vesting statute is constitutional only if it refers to contingent vesting. *See Jones v. Sterling*, 210 Ariz. 308, 314–15 ¶ 27, 110 P.3d 1271, 1277–78 (2005) (providing that when we can avoid constitutional doubt by interpreting a statute in a manner that does no violence to its text, we will adopt that interpretation); *Kotterman v. Killian*, 193 Ariz. 273, 284 ¶ 31, 972 P.2d 606, 617 (1999) ("[W]e resolve all uncertainties [regarding a statute] in favor of constitutionality."). Our interpretation preserves the statute's constitutionality because it does not affect the earlier established substantive right to particular retirement benefits. *See In re Shane B.*, 198 Ariz. 85, 87 ¶ 8, 7 P.3d 94, 96 (2000) (providing that an exception to the general prohibition on retroactive application of statutes is that "a statute does not have impermissible retroactive effect if it is merely procedural and does not affect an earlier established substantive right").

¶33 Consequently, under *Yeazell* and the vesting statute, a public employee's interest in a retirement benefit or pension becomes a right or entitlement at the outset of employment, but the right to begin collecting pension benefits is contingent upon completing the requirements for retirement eligibility. *See Fields*, 234 Ariz. at 221 ¶ 31, 320 P.3d at 1167 (providing that although the right to receive a pension "vest[s] upon acceptance of employment," the pension is "subject to conditions precedent, such as completing the term of employment"); *Krucker v. Goddard*, 99 Ariz. 227, 230, 408 P.2d 20, 22 (1965) (providing that a plan member's right to withdraw contributions vested because he "had fulfilled

every condition precedent to having his contributions returned"); *Cross v. Elected Officials Ret. Plan*, 234 Ariz. 595, 600 ¶ 12, 325 P.3d 1001, 1006 (App. 2014) ("When the Plan accepts a member's application for retirement, pension rights 'vest' in that only then may the member begin to receive the benefits."). Consequently, because the Class Members have a binding contract under *Yeazell* and because the employees and the State have not agreed to modify that contract, the vesting statute, by itself, does not permit the Legislature to unilaterally change the terms of that contract to the employees' detriment. Accordingly, the Bill's changes to the benefit increases formula and the contribution rate provisions violate *Yeazell* by unilaterally modifying the Class Members' contracts with the State.

## ISSUES ON CROSS APPEAL

### A. Attorneys' Fees

¶34 On cross-appeal, the Class Members first argue that they are entitled to attorneys' fees incurred before the trial court under A.R.S. § 12–341.01 because the action arose out of contract. EORP counters that A.R.S. § 12–341.01 is inapplicable because the action arose from constitutional or statutory obligations, not contractual obligations, even though the members' employment contracts were implicated. We review de novo the applicability of A.R.S. § 12–341.01. *See Ahwatukee Custom Estates Mgmt. Ass'n, Inc. v. Bach*, 193 Ariz. 401, 402 ¶ 5, 973 P.2d 106, 107 (1999).

¶35 Section 12–341.01(A) provides that a court may award reasonable attorneys' fees to the successful party in "any contested action arising out of a contract, express or implied." When questions of contract are combined with other questions, judicial analysis whether the action is sufficiently contractual to invoke A.R.S. § 12–341.01(A) "has aptly focused on the substance of the action and the statutory policy to mitigate the burden of the expense of litigation to establish a just claim or defense." *A.H. By & Through White v. Ariz. Prop. & Cas. Ins. Guar. Fund*, 190 Ariz. 526, 529, 950 P.2d 1147, 1150 (1997) (internal quotation marks and citation omitted). The mere existence of a contract somewhere in the transaction is insufficient to support a fee award. *Id.* That is, "when the cause of action arises from statutory rather than contractual obligations, the peripheral involvement of a contract does not require the application of [A.R.S.] § 12–341.01(A)." *Id.* (internal quotation marks and citation omitted).

¶36        Although this action might first appear to arise from constitutional or statutory interpretation, as EORP urges, a closer examination of the operation of those contractual provisions reveals otherwise. Sections 38–810 and 38–818 are part of the Plan's statutory scheme to provide retirement benefits for elected officials. A.R.S. § 38–802. The Plan's fund is used "exclusively for payment of benefits to retired members or their beneficiaries" and "for payment of the administration, operation and investment expenses of the plan." *Id.*

¶37        As recognized in *Yeazell*, because the Gift Clause forbids the Legislature from providing gratuities, the right to receive retirement benefits necessarily arose as a condition of the employee's contract of employment. *See* 98 Ariz. at 114, 402 P.2d at 544. The Plan is therefore a creature of statute that assumes the contractual obligations between the State and public employees and exists to administer the statutorily-imposed duties of generating assets for benefit payments to retired members or their beneficiaries. Thus, the Plan's relationship with the Class Members is governed by the members' employment contracts with the State. Section 12–341.01 is therefore applicable to disputes between the Plan and Class Members because the Plan's obligation is determined by the underlying employment contracts. *See Pendergast v. Ariz. State Ret. Sys.*, 234 Ariz. 535, 542 ¶ 23, 323 P.3d 1186, 1193 (App. 2014) (providing that a public employee was entitled to attorneys' fees on appeal when the Arizona State Retirement System appealed the trial court's finding that application of a statute limiting the employee's purchase of credited service violated the Pension Clause, because the matter arose out of contract). Consequently, because this action arose out of the contractual relationship between the Class Members and the State, it arose out of contract and is properly within the scope of the attorneys' fees statute.

### B.    Prejudgment Interest

¶38        The Class Members next contend that they are entitled to prejudgment interest on the principal amounts due under the judgment. EORP counters that the Class Members are not entitled to such an award because EORP cannot be charged interest on money it was not legally obligated or able to pay and that the Plan statutes provide the sole remedy for the Class Members. We review de novo whether a party is entitled to

prejudgment interest. *Gemstar Ltd. v. Ernst & Young*, 185 Ariz. 493, 508, 917 P.2d 222, 237 (1996).

**¶39**        Although the trial court found that awarding prejudgment interest in this case would not serve the purposes of prejudgment interest, "prejudgment interest on a liquidated claim is a matter of right" in a contract action. *Metzler v. BCI Coca-Cola Bottling Co.*, 235 Ariz. 141, 144 ¶ 11, 329 P.3d 1043, 1046 (2014) (citation and quotation marks omitted). A claim is liquidated "if the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance upon opinion or discretion." *Schade v. Diethrich*, 158 Ariz. 1, 14, 760 P.2d 1050, 1063 (1988) (citation omitted).

**¶40**        Here, the principal amounts due are liquidated because they may be computed with exactness. One principal amount due is the excess payment contributions made by all Class Members. The other principal amount due is the delayed payments of permanent benefit increases under the former benefit increases formula to judges who have retired before this action has concluded. These amounts are readily determinable. Consequently, because the principal amounts due can be computed with exactness, the Class Members are entitled to prejudgment interest on those amounts at the rate determined pursuant to A.R.S. § 44–1201(F) (setting the rate for prejudgment interest).

## C.    Relief Also Against the State

**¶41**        The Class Members argue finally that judgment should also run against the State because the State voluntarily intervened and actively litigated the case. The State counters that the Class Members will obtain all the relief to which they may be entitled from EORP and that it intervened for the limited purpose of defending the Bill's constitutionality. We hold that under the facts here, relief should also run against the State.

**¶42**        Arizona courts have previously held that intervenors may seek relief in civil rights actions, have judgments run against them, and be the prevailing party for purposes of the attorneys' fees statute. *See, e.g.*, *Civil Rights Div. of Ariz. Dep't of Law v. Super. Ct. In & For Pima Cty.*, 146 Ariz. 419, 426-27, 706 P.2d 745, 752-53 (App. 1985) (providing that attorneys' fees which the Legislature intended could be recovered in civil rights actions are a form of relief that may be sought only by individual plaintiffs or intervenors); *Ariz. Ctr. for Law in Pub. Interest v. Hassell*, 172 Ariz. 356, 371–

72, 837 P.2d 158, 173–74 (App. 1991) (allowing judgment to run against intervenor-defendants and awarding plaintiffs attorneys' fees against defendants and intervenor-defendants under the private attorney general doctrine); *McKesson Chem. Co., a div. of Foremost-McKesson, Inc. v. Van Waters & Rogers*, 153 Ariz. 557, 739 P.2d 211 (App. 1987) (remanding for the trial court to determine whether intervenor-defendant was entitled to attorneys' fees as prevailing party and awarding intervenor-defendant attorneys' fees incurred on appeal).

¶43        Therefore, relief can run against an intervenor-defendant. Here, the State elected to intervene as a defendant—referring to itself as "Intervenor Defendant" in several pleadings—and fully participated in this litigation, as well as in *Fields*. Although the Class Members did not amend their complaint to assert a claim against the State, they did notify the parties that they would seek relief against EORP and the State. "It would be hypertechnical and unjust to preclude [Class Members] from recovering [relief] that they have earned, merely for failure to amend their complaint to expressly include [the State] within their demand for judgment." *Hassell*, 172 Ariz. at 371–72, 837 P.2d at 173–74. Consequently, under the facts presented, relief should also run against the State.

### III.    CONCLUSION

¶44        For the foregoing reasons, we affirm the trial court's judgment with respect to the unconstitutionality of the two provisions of the Bill at issue, but reverse with respect to the court's denial of attorneys' fees, prejudgment interest, and relief against the State. On appeal, the Class Members request attorneys' fees pursuant to A.R.S. § 12–341.01. In our discretion, we deny their request.

CATTANI, J., concurring.

**¶45**          I concur in the court's analysis, but I write separately to express my view that the superior court correctly ruled that Senate Bill 1609's change to the Class Members' contribution rate violates the Pension Clause of the Arizona Constitution. From my perspective, changing the employees' pension contribution rate specified by statute—and thereby decreasing the employer's funding share—diminished the employee's public retirement system benefit. And because the Pension Clause provides that "public retirement system benefits shall not be diminished or impaired," Ariz. Const. art. 29, § 1(C), the Bill is unconstitutional regardless whether it would survive scrutiny under the Contract Clause, and the remand urged by the dissent is unnecessary.

**¶46**          The defined benefit pension system to which Class Members belong guarantees each Class Member fixed monthly benefit payments from the time of retirement for the remainder of the retiree's life. The cost of funding the post-retirement benefit payments is shared by Class Members and the State, with Class Members paying a fixed percentage of their salary at the rate specified in A.R.S. § 38-810, and the State responsible for the balance necessary (beyond investment earnings) to ensure the actuarial soundness of the pension system.

**¶47**          EORP and the State, as well as the dissent, posit that the Bill did not diminish or impair Class Members' pension benefits because the Bill did not change the guaranteed monthly payments to which Class Members are entitled upon retirement. But under that view, the Legislature could unilaterally increase the employees' contribution rate to the point that Class Members shoulder the entire cost of funding the public pension system rather than sharing the cost between employee and employer. And it would be nonsensical to suggest that converting a public employee's employer-provided retirement benefit into an entirely self-funded retirement plan would not diminish the employee's "public retirement system benefits."

**¶48**          The same logic applies to a partial reduction in the employer's share of contributions to a retirement plan. Consider, for example, an employment agreement in which an employer agreed to share in the cost of a $1,000,000 retirement annuity (to be purchased on the date of retirement) that would pay the employee $5,000 per month for the rest of the

employee's life. If the employer agreed to pay 60 percent ($600,000) of the cost to fund the annuity, with the employee responsible for the remaining 40 percent ($400,000), the value of the retirement benefit provided by the employer would be $600,000 as of the date of retirement. Under that scenario, increasing the employee's share to 50 percent and reducing the employer's contribution to 50 percent would mean that the value of the retirement benefit provided by the employer would only be $500,000, which would obviously be a reduction in that benefit.[6]

**¶49** This example highlights that the benefit to an employee participating in a pension plan should not be measured—as the dissent suggests—as simply the sum of the retirement payments received during a retiree's lifetime. Rather, the value of the benefit to the employee is the amount the *employer* contributes to guarantee the stream of post-retirement payments. And when the employee's contribution rate is a factor in determining the amount of the employer's contribution, the employee's contribution rate is a protected benefit under the Pension Clause.[7] *Cf. Fields v. Elected Officials' Ret. Plan*, 234 Ariz. 214, 219–20, ¶¶ 24–29 (2014) (holding that the statutory formula for determining retiree benefit increases constitutes a pension benefit for purposes of the Pension Clause). Thus, a

---

[6] The dissent asserts that a guaranteed annuity as of the date of retirement is not an accurate way to portray Class Members' retirement benefits because "in reality, under EORP, the payments are made and calculated during employment, based not only on that particular employee's circumstances but the pension system as a whole." But while calculating the funding needed for the public retirement system admittedly requires a more complex actuarial model than this illustration, the shared funding obligations and fixed post-retirement payments of this guaranteed annuity example are in fact similar to the relevant provisions of the Class Members' defined benefit pension.

[7] The retirement payment amount is similarly protected under the Pension Clause. Assuming (as § 38–810 specified) a fixed employee contribution rate, a reduction in the post-retirement payment obligation would reduce the employer's funding share, thus diminishing the employee's pension benefit in violation of the Pension Clause.

unilateral increase in the employee's contribution rate violates the Pension Clause.

**¶50** The dissent relies on *Taylor v. City of Gadsden*, 767 F.3d 1124 (11th Cir. 2014), and *Borders v. City of Atlanta*, 779 S.E.2d 279, 281 (Ga. 2015), to suggest that courts in other jurisdictions have concluded that pension contribution rates are not a "benefit." But the analysis in those cases is based on a critical distinction: in both *Taylor* and *Borders*, the terms of the pension plan from the outset expressly allowed modification. *Taylor* involved a pension system in which the employee handbook "explicitly stated that the 'member contribution rate is determined by statute and subject to change by the Alabama Legislature.'" 767 F.3d at 1129. The retirement plan at issue in *Borders* "unambiguously provide[d] for subsequent modification or amendment." 779 S.E.2d at 282. The Pension Clause is only implicated when a promised benefit is "diminished or impaired," and modifying the contribution rate in those circumstances did not take away a promised pension benefit precisely because the employment contract authorized the modification.

**¶51** There is no such modification provision applicable to Class Members in this case. Section 38-810 specified a fixed 7% employee contribution rate, and no representations were ever made to Class Members that their contribution rate could vary in any way. Had Class Members been advised at the outset of their employment that their contribution rate was subject to change by the Legislature (effectively setting a variable formula for employee and employer contribution rates), Class Members—like the employees in *Taylor* and *Borders*—would not have a claim under the Pension Clause that a promised benefit was taken away.

**¶52** And therein lies the problem underlying the position taken by EORP and the State, as well as the dissent, because the analysis turns on the question of what pension benefits employees were promised when they were hired. At its core, this case is based on the simple premise that employees who accept employment are entitled to rely on promises made as part of their employment contract. And when those promises involve pension benefits for state employees, that guarantee carries constitutional weight. Here, because Class Members were promised a specified (fixed) pension contribution rate as part of their initial employment contract, the Bill's changes to that rate diminished a promised benefit and thus contravened the Pension Clause.

**¶53**        The dissent asserts that the employee contribution rate was in fact variable, and that the Bill thus did not result in a Pension Clause violation. Although the constitutional provision regarding public retirement systems contemplates that *total contributions* will vary as necessary to ensure actuarial soundness, *see* Ariz. Const. art. 29, § 1(A), the provision says nothing about the employees' and employer's relative share of the total contribution amounts. And nothing in the language of § 38-810 or the terms of employment under which Class Members were hired suggests a variable rate.[8] Rather, § 38-810 (as it existed when each of the Class Members was hired) specified an employee contribution rate of 7% of salary, and this became a provision of the employment contract on which each Class Member was entitled to rely.

**¶54**        The dissent notes that § 38-810 "has never contained language indicating an expectation or guarantee." But the language of the statute creates precisely that expectation by imposing a fixed contribution rate for Class Members. And that language is in stark contrast to statutory language the Legislature has used in establishing other pension plans—such as ASRS—that impose a variable employee contribution rate. *See* A.R.S. § 38-736 (specifying that ASRS "member contributions are a percentage of a member's compensation equal to the employer contribution").[9]

---

[8]      The dissent asserts that the employee contribution rate specified by § 38-810 "has varied over time," and that the rate "has changed multiple times over the years." In fact, the rate was changed only once: an increase from 6% to 7% in 1987, shortly after EORP was created. A single statutory modification almost three decades ago—and over a decade before adoption of the Pension Clause—does not establish that the rate is variable at the Legislature's will, much less that such modification comports with the strictures of the Pension Clause. Nor does it foreclose the argument—not at issue here—that an employee hired with the promise of a 6% contribution rate would be entitled to that rate notwithstanding the statutory change.

[9]      This means that for ASRS members, who as the dissent acknowledges make up the overwhelming majority of state employees (approximately 535,000 of 582,000), the contribution rate is not fixed as a specified percentage of the employee's salary, but—consistent with the statutory terms of the employment contract—can increase or decrease (just

**¶55**        The Legislature could have similarly designed EORP from the outset with a variable employee contribution rate.  But it is not our role to rewrite the original statute or adopt language from other statutes.  *See Hughes v. Jorgenson*, 203 Ariz. 71, 73, ¶ 11 (2002) (noting presumption that "the legislature has said what it means"); *see also Comm. for Pres. of Established Neighborhoods v. Riffel*, 213 Ariz. 247, 249–50, ¶ 8 (App. 2006) (noting that "when the legislature uses different language within a statutory scheme, it does so with the intent of ascribing different meanings and consequences to that language").

**¶56**        Finally, the dissent misses the mark by suggesting that this case "freez[es] employee contribution rates in perpetuity."  Nothing in the court's opinion prevents the State from prospectively specifying—as part of an initial employment contract—that a defined-benefit employee is subject to a variable contribution rate or, as the State has actually done for judges appointed after the effective date of the Bill, provide new employees with a defined contribution pension plan.  Moreover, although the dissent references pension systems involving other types of state employees while highlighting the economic concerns underlying pension reform proposals, the court's decision addresses only a small percentage of state employees (judges) who are part of an independent branch of government and whose positions carry added constitutional protections.  *See* Ariz. Const. art. 6, § 33 (providing that the Legislature cannot remove judges from office or reduce their salary).  And although the State cannot fire judges or reduce their salaries, nothing prevents the State from negotiating a change to the contribution rate for judges and incentivizing such a change by, for example, conditioning future raises on an agreement to accept a higher contribution rate.  Accordingly, the court's decision does not "lock in" an unworkable contribution rate in perpetuity, and instead simply requires that changes to promised pension benefits be carried out in a manner that comports with constitutional principles.

---

as the State's rate can correspondingly go up or down) depending on the amount needed to fund the overall ASRS pension fund.

HON. HALL ET AL V. EORP/STATE
JUSTICE BOLICK, joined by JUDGE TREBESCH, Dissenting in Part and
Concurring in the Judgment in Part

BOLICK, J., joined by TREBESCH, J., dissenting in part and concurring in the judgment in part.

**¶57**          The majority today holds unconstitutional statutory changes to the permanent benefit increase ("PBI") formula and contribution rates as applied to active members of EORP.  We respectfully dissent from the holding that changes to contribution rates are unconstitutional and otherwise concur in the result.

**¶58**          This case involves an anomaly that is largely this Court's invention.  Most Arizona state employees are at-will employees.  EORP's active members are either elected officials or judges who serve for fixed terms.  No formal contract exists between the state and those employees.  However, in a work of legal fiction to which the likes of John Grisham could only aspire, this Court fifty-one years ago implied such a contract for purposes of pension benefits, whose terms are largely set upon the employment date and whose benefits extend far beyond retirement until the employees' beneficiaries pass on.  *See Yeazell*, 98 Ariz. at 117, 402 P.2d at 546.  The voters subsequently incorporated much of that legal relationship into our Constitution.  Ariz. Const. art. 29, § 1.  We are impelled by that law to agree with the majority that the change in the PBI formula is impermissible.  But by freezing employee contribution rates in perpetuity, the majority goes far beyond anything contemplated by our jurisprudence or the Constitution, thereby jeopardizing the Plan's financial integrity, imposing an enormous uncontemplated burden on taxpayers, and preventing the state from reasonably requiring employees to shoulder part of the increased burden of paying for their own retirement benefits.

## I.

### A.  Factual Background

**¶59**          Arizona has four statewide retirement plans for public employees:  the Arizona State Retirement System ("ASRS"), EORP, the Public Safety Personnel Retirement System ("PSPRS"), and the Corrections Officers Retirement Plan ("CORP").  *See* Hayleigh S. Crawford, *Going For Broke: Arizona's Legal Protection of Public Pension Benefits*, 46 Ariz. St. L.J. 635,

HON. HALL ET AL V. EORP/STATE
JUSTICE BOLICK, joined by JUDGE TREBESCH, Dissenting in Part and
Concurring in the Judgment in Part

655 (2014). EORP is by far the smallest.[10] All are "defined benefit" systems, which means they are "funded by employer and employee contributions and guarantee[] the employee a certain benefit upon retirement." *Id.* at 639-40.

**¶60** In 1985, the Legislature enacted EORP, which provided to elected officials, including judges, a pension in the amount of three and one-third percent of salary for each year worked, up to eighty percent of average yearly salary after twenty years of employment, which was increased to four percent in 1988. *See* 1985 Ariz. Sess. Laws, ch. 309, § 4 (1st Reg. Sess.) (codified at A.R.S. § 38-808(B)(1) (1985)). That promised benefit, which essentially places elected officials and judges on par with first responders, has never been changed.

**¶61** The EORP Plan has four funding sources: employer contributions, employee contributions, court filing fees, and investment proceeds. The employee contribution rate is set by statute and has changed over time. In 1985, it was set at six percent of the employee's gross salary. *See id.* (codified at A.R.S. § 38-810(A) (1985)). In 1987, it was increased to seven percent. *See* 1987 Ariz. Sess. Laws, ch. 146, § 4 (1st Reg. Sess.) (codified at A.R.S. § 38-810(A) (1987)).

**¶62** By contrast, employer contributions are determined by actuarial calculations of the amount needed to fund the plan in light of projected payouts and investment income, in order to cover both normal service costs and the amortized amount of the unfunded actuarial accrued liability over a period not to exceed thirty years. In recent years, the employer contribution rate has increased dramatically, from a low of 6.97 percent of each employee's salary in 2002 to 29.79 percent in 2011, the year in which the reform at issue was adopted. According to EORP, the rate has continued to increase every year since then, to 39.62 percent in the fiscal year ending in 2014. In other words, the employer's contribution rate has increased 568 percent in twelve years.

**¶63** Also at issue in this case are "permanent increases in base

---

[10] ASRS covers about 535,000 members, EORP has approximately 2,000, and PSPRS and CORP together have about 45,000. *Id.*

28

HON. HALL ET AL V. EORP/STATE
JUSTICE BOLICK, joined by JUDGE TREBESCH, Dissenting in Part and
Concurring in the Judgment in Part

benefits" for retired employees. In 1990, the state enacted the first statutory PBI formula, providing retirement payment increases based on the Plan's investment earnings. 1990 Ariz. Sess. Laws, ch. 236, § 4 (2d Reg. Sess.) (codified at A.R.S. §§ 38-818(B), (E), (F) (1990)). If investments returned more than nine percent, half of the return would be used to fund increases up to four percent, with any remainder placed into a reserve for future benefits increases. *Id.* After that statute expired in 1994, the Legislature enacted a new PBI formula the following year. Increases were based on the Plan's investment returns, capped at the lesser of three percent or half of the percentage change in the consumer price index. 1996 Ariz. Sess. Laws, ch. 198, § 1 (2d Reg. Sess.) (codified at A.R.S. § 38-818(F) (1996)). In 1998, the Legislature raised the maximum possible increase to four percent and eliminated any reference to the inflation rate. 1998 Ariz. Sess. Laws, ch. 264, § 1 (2d Reg. Sess.) (codified at A.R.S. § 38-818(F) (1998)). That statutory formula remained in place until S.B. 1609. According to EORP, since the 1998 change, EORP retirees received a four percent annual benefit increase each year until the end of fiscal year 2010.

¶64 The statute at issue in this case is part of a nationwide effort to reform public pensions. As a result of recession and insufficient contributions, as of 2010, public pensions for state employees nationally were underfunded by an estimated one trillion dollars. Pew Center on the States, *The Trillion Dollar Gap: Underfunded State Retirement Systems and the Roads to Reform* at 1-3 (2010). Between 2008 and 2013, every state passed some type of pension reform legislation. *See* National Conference of State Legislatures, *Pensions and Retirement State Legislation*, *available at* http://www.ncsl.org/research/fiscal-policy/pension-legislation-database.aspx (last visited Mar. 7, 2016).

¶65 Arizona's public pensions were not immune to these financial challenges. In 2010, Arizona taxpayers were paying at least $1.39 billion annually to fund the state pension systems, a 448 percent increase from ten years previously and more than the estimated cost for higher education, corrections, or healthcare for indigent people. Crawford at 637. Serious reversals in investment returns in 2000, 2008, and 2009, combined with significant actuarial errors pertaining to the PBI mechanism, contributed to what EORP characterizes as "dramatic decreases" in the Plan's funding ratio—a benchmark of financial soundness calculated by dividing the plan's assets by its liabilities. The funding ratio decreased from 141.7

HON. HALL ET AL V. EORP/STATE
JUSTICE BOLICK, joined by JUDGE TREBESCH, Dissenting in Part and
Concurring in the Judgment in Part

percent in 2001 to 58.4 percent in 2012, a decline EORP considers "alarming." *See generally Fields*, 234 Ariz. at 217 ¶ 8, 320 P.3d at 1163 (recounting declining funding ratio). Based on record evidence, EORP suggests that an "80% funding ratio is a generally accepted indicator of a healthy pension plan." Additionally, EORP's PBI reserve for future benefit increases declined from more than $40 million in 2000 to zero in 2011. In sum, EORP was severely under-funded, rendering precarious its ability to pay future pension obligations.

¶66        In an effort to place EORP, CORP, and PSPRS on a more sound financial footing, the Legislature passed S.B. 1609 in 2011. As relevant here, the statute increased the employee contribution rate from seven percent to ten percent for fiscal year 2011-12, to 11.5 percent in 2012-13, and a maximum of thirteen percent thereafter. A.R.S. § 38-810(F)(1)-(4) (2011), *renumbered as* A.R.S. § 38-810(G)(1)-(4) (2013). The Legislature also included a "maintenance of effort" clause, which provides that employee contributions above seven percent of salary shall not be used to reduce the employer's contribution. A.R.S. § 38-810(G) (2011), *renumbered as* A.R.S. § 38-810(H) (2013).

¶67        Senate Bill 1609 also made changes to the PBI formula in EORP, PSPRS, and CORP. First, it ended future inflows into the PBI reserve fund. A.R.S. § 38-818.01(E). Second, it increased the investment return rate upon which future PBIs would be calculated. A.R.S. § 38-818.01(D). Finally, it maintained a four percent maximum for future benefit increases, it pegged such increases to the Plan's funding ratio, with larger benefit increases as the actuarial soundness of the Plan improved. A.R.S. § 38-818.01(C). These changes—the increased employee contribution rate and the changes in the PBI formula—are at issue here.

¶68        In 2013, EORP was closed to new members so that elected officials and judges taking office thereafter are no longer eligible. 2013 Ariz. Sess. Laws, ch. 216, § 9 (1st Reg. Sess.). Instead, they participate in a "defined contribution" program.[11]

---

[11]        A defined contribution plan does not provide a guaranteed benefit amount at retirement. Rather, employers and employees contribute to a

HON. HALL ET AL V. EORP/STATE
JUSTICE BOLICK, joined by JUDGE TREBESCH, Dissenting in Part and
Concurring in the Judgment in Part

## B. Applicable law

¶69    The Contract Clause of our Declaration of Rights, comprised by Arizona Constitution article 2, section 25, provides that "no . . . law impairing the obligation of a contract[] shall ever be enacted." Historically, Arizona courts have applied the United States Supreme Court's test for determining violations of the Contract Clause of the Federal Constitution. In order to violate the Contract Clause, a law must substantially impair a contractual relationship. The state may justify the impairment by demonstrating a significant, legitimate public purpose, and that the impairment is reasonable and appropriate. *See, e.g.*, *Fund Manager, Pub. Safety Pers. Ret. Sys. v. City of Phoenix Police Dep't Pub. Safety Pers. Ret. Sys. Bd.*, 151 Ariz. 487, 491, 728 P.2d 1237, 1241 (App. 1986) (citing *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411-12 (1983)).

¶70    This Court first held that public pension benefits are contractual rights in *Yeazell*. 98 Ariz. at 114-15, 402 P.2d at 544-45. Because the Arizona Constitution prohibits gifts of public funds to individuals,[12] the Court reasoned that "state pensions cannot be sustained as constitutional unless anchored to a firmer basis than that of a gift." *Id.* at 112, 402 P.2d at 543. On that basis, the Court determined that public pensions are contractual in nature, and that "[c]ontroversies as to those rights should be settled consistent with the law applicable to contracts." *Id.* at 113-14, 402 P.2d at 544.

¶71    More specifically, the Court held that "the laws of the state are a part of every contract." *Id.* at 113, 402 P.2d at 544. Because retirement benefits are "a valuable part of the consideration for the entrance into and continuation in public employment," the "right to a pension becomes vested upon acceptance of employment." *Id.* at 115, 402 P.2d at 545. A

---

plan in which benefits are based on contributions plus or minus investment returns.

[12]    The Gift Clause, in article 9, section 7 of the Arizona Constitution provides, "Neither the state, nor any . . . subdivision of the state shall ever . . . make any donation or grant, by subsidy or otherwise, to any individual, association, or corporation . . . ."

HON. HALL ET AL V. EORP/STATE
JUSTICE BOLICK, joined by JUDGE TREBESCH, Dissenting in Part and
Concurring in the Judgment in Part

"contract cannot be unilaterally modified nor can one party to a contract alter its terms without the assent of the other party." *Id.* Applying those principles, the Court held that a legislative amendment "may not be arbitrarily applied retroactively to impair the contract" as it existed at the time the employment relationship was established. *Id.* at 117, 402 P.2d at 546.

¶72         The Court in *Yeazell* and subsequent cases essentially created a one-way ratchet. Baseline benefits are set on the employment date. They can be increased but never decreased without members' consent. Such un-bargained for, open-ended benefits are hardly compelled by the Gift Clause, though they might well be forbidden by it. *Cf. Turken v. Gordon*, 223 Ariz. 342, 351 ¶ 43, 224 P.3d 158, 167 (2010) (payments of public funds must be supported by consideration that is not disproportionate to the value received). In dissent, Justice Udall declared that the majority opinion "had no support in reason or logic nor the case law . . . and will create problems far beyond the immediate controversy." *Yeazell*, 98 Ariz. at 124, 402 P.2d at 551 (Udall, J., dissenting). Justice Udall was prescient.

¶73         However, the *Yeazell* decision embraced a vitally important limiting principle to ensure that the supposed pension contract would not necessarily be a financial suicide pact for the taxpayers. "We do not . . . mean to imply what rights or remedies might be available to either party in a situation where it is established that a retirement plan is actuarially unsound," the Court declared. *Id.* at 117, 402 P.2d at 546. In such circumstances, the Court stated, ordinary contract principles such as mutual mistake of fact could be applied to modify or rescind a contract in appropriate circumstances. *Id.* at 116, 402 P.2d at 546. Specifically, if both parties "labored under the mistaken assumption that there was a fund sufficient to afford . . . beneficiaries of the fund the amount provided" by the original plan, the state could modify the contract if it carried its burden of proving the mutual mistake. *Id.* Although the State presented abundant evidence that EORP was structurally unsound prior to S.B. 1609, the trial court never addressed the question of mutual mistake, instead disposing of the case entirely under the Pension Clause of our Constitution.

¶74         In 1998, upon legislative referral, Arizona voters enacted Proposition 100, which added article 29, section 1 to the Arizona Constitution. Most relevant to the issues presented here is section C, which

HON. HALL ET AL V. EORP/STATE
JUSTICE BOLICK, joined by JUDGE TREBESCH, Dissenting in Part and
Concurring in the Judgment in Part

provides, "Membership in a public retirement system is a contractual relationship that is subject to article II, section 25 [the Contract Clause], and public retirement system benefits shall not be diminished or impaired."[13]

**¶75**        In *Fields*, this Court struck down under the Pension Clause S.B. 1609's change in the permanent benefit increase formula as to *retired* EORP members.   234 Ariz. at 221 ¶ 34, 320 P.3d at 1167.   The Court concluded that the statutorily prescribed permanent benefit increase formula is a Plan "benefit," and that S.B. 1609's formula modification violated article 29, section 1 because it "diminishes and impairs the retired members' benefits."  *Id.* at 216 ¶ 1, 220-22 ¶¶ 30-36, 320 P.3d at 1162, 1166-68.

**¶76**        In this action, on cross-motions for summary judgment, the trial court concluded that the changes to the permanent benefit increase formula and contribution rates for active Plan members violated the Pension Clause.  Because it so ruled, it did not reach any of the other constitutional issues.  Although we agree with the majority's outcome on the PBI formula issue, we believe that the contribution rate is not a pension "benefit," and that the trial court improperly granted summary judgment to the plaintiffs without considering defendants' defenses under *Yeazell* or the Contract Clause.

## II.

### A.  The Pension Clause

**¶77**        Although the majority reaches the Pension Clause issue only with regard to the PBI formula and not to contribution rates, we consider it in both contexts because it was the sole basis for the trial court's contribution rates ruling as embraced by the concurring opinion.

**¶78**        "In interpreting a constitutional amendment, our primary purpose is to 'effectuate the intent . . . of the electorate that adopted it.'"  *Id.*

---

[13]        This provision is now codified in sections C and D of article 29, section 1 of the Arizona Constitution. *See* Laws 2016, S.C.R. 1019, § 1, Prop. 124, approved election May 17, 2016, eff. May 26, 2016.

HON. HALL ET AL V. EORP/STATE
JUSTICE BOLICK, joined by JUDGE TREBESCH, Dissenting in Part and
Concurring in the Judgment in Part

at 219 ¶ 19, 320 P.3d at 1165 (quoting *Jett v. City of Tucson*, 180 Ariz. 115, 119, 882 P.2d 426, 430 (1994)).  In doing so, we give words "the meaning most common to the ordinary individual."  *Downs v. Sulphur Springs Valley Elec. Coop.*, 80 Ariz. 286, 293, 297 P.2d 339 (1956); *accord Fields*, 234 Ariz. at 219 ¶ 19, 320 P.3d at 1165.

**¶79**        In addition to the text's plain language, the ballot pamphlet can aid in determining the electorate's intent.  *See Calik v. Kongable*, 195 Ariz. 496, 498 ¶ 10, 990 P.2d 1055, 1057 (1999).  The ballot measure's proponents (no opponents submitted statements) all address one overriding purpose: to prevent the legislature from raiding pension funds, which had occurred in other states.  *See* Ariz. Sec'y of State, 1998 Publicity Pamphlet 6-12 (1998), *available                                                        at* http://apps.azsos.gov/election/1998/Info/PubPamphlet/Prop100.html.

**¶80**        That objective reflects in the first two of article 29, section 1's three substantive provisions.  Subsection A declares, "Public retirement systems shall be funded with contributions and investment earnings using actuarial methods and assumptions that are consistent with generally accepted actuarial standards."  Subsection B provides, "The assets of public retirement systems, including investment earnings and contributions, are separate and independent trust funds and shall be invested, administered and distributed as determined by law solely in the interests of the members and beneficiaries of the public retirement systems."

**¶81**        On its face, subsection C, at issue here, makes two changes from prior law regarding pension contracts.[14]  First, it establishes that "[m]embership in a public retirement system is a contractual relationship that is subject to article II, § 25," the Contract Clause.  This language marks a significant departure from *Yeazell* and its progeny because instead of applying ordinary contract principles to pension contract terms, it establishes that the relationship is subject to Contract Clause rules, which

---

[14]       We presume that the legislature (in this instance, the measure's drafters and the electorate) knows the prior law, and if it changes that law, that it intends that those changes have real and substantial effect.  *See, e.g.*, *Stone v. I.N.S.*, 514 U.S. 386, 397 (1995); *Brousseau v. Fitzgerald*, 138 Ariz. 453, 455, 675 P.2d 713, 715 (1984).

HON. HALL ET AL V. EORP/STATE
JUSTICE BOLICK, joined by JUDGE TREBESCH, Dissenting in Part and
Concurring in the Judgment in Part

generally provide greater leeway to contract modifications by government. *See, e.g.*, *Fund Manager, Pub. Safety Pers. Ret. Sys.*, 151 Ariz. at 491, 728 P.2d at 1241. As a result, this change is extremely consequential for the present case.

**¶82**　　　　Second, subsection C states that "public retirement system *benefits* shall not be diminished or impaired." This too marks a departure from prior law, more favorable to Plan members and beneficiaries in this instance because it suggests that benefits cannot be diminished or impaired *period*, even in light of contract defenses that might previously have been raised under *Yeazell*.

**¶83**　　　　It therefore makes an enormous difference whether a particular pension contract provision is a "benefit." If so, it is legally sacrosanct; if not, it is subject to the Contract Clause's modification rules. The Court recognized this crucial distinction in *Fields*, declaring that the "Contract Clause applies to the general contract provisions of a public retirement plan, while the Pension Clause applies only to public retirement benefits." 234 Ariz. at 218 ¶ 17, 320 P.3d at 1164. In this case, the majority correctly applies the changes wrought by the Pension Clause to invalidate changes to the PBI formula, but improperly ignores them in order to strike down the change in contribution rates.

## B. Permanent benefit increases

**¶84**　　　　This Court decided in *Fields* that the PBI formula for retired Plan members is a benefit. Because S.B. 1609 diminished or impaired that benefit, it violated the Pension Clause. 234 Ariz. at 220 ¶¶ 26-27, 320 P.3d at 1166.

**¶85**　　　　The State and EORP argue that the vesting statute, A.R.S. § 38-810.02, changed the pension contract for employees hired after its 2000 effective date. Specifically, they urge that for such employees, benefits do not vest until retirement, hence the state may determine benefit increases upon retirement.

**¶86**　　　　As a general proposition, we agree with defendants that the state is free to change pension terms or benefits or eliminate them altogether for new employees, as the state did by changing to a defined-contribution system for judges and elected officials in 2013. But their

HON. HALL ET AL V. EORP/STATE
JUSTICE BOLICK, joined by JUDGE TREBESCH, Dissenting in Part and
Concurring in the Judgment in Part

interpretation of the vesting statute collides with the contractual nature of public pensions, under *Yeazell* and as embraced and modified by article 29, section 1. Prior to the vesting statute in 2000, all seem to agree that Plan members had a contractual expectation of a particular formula for permanent benefit increases. The State and EORP posit that after the vesting statute, that contractual expectation was replaced by a contingent expectation; that is, the state may determine benefit increases upon retirement.

¶87        Such a contingent, open-ended possibility fails for two reasons. First, it does not provide a sufficiently definite term to satisfy the requirement of contractual consideration. *See, e.g.*, *Savoca Masonry Co. v. Homes & Son Constr. Co.*, 112 Ariz. 392, 394, 542 P.2d 817, 819 (1975) (requiring sufficient specification of terms for mutual assent). Second, it raises the Gift Clause concerns that animated the *Yeazell* decision because the state is deciding the amount of compensation after work is performed, thus giving rise to the prospect of a gift rather than proportionate, bargained-for consideration. 98 Ariz. at 112-13, 402 P.2d at 543-44.

¶88        Accordingly, we conclude that the vesting statute did not alter the contractual expectations of EORP Plan members, and thus the Court's conclusion in *Fields* that the PBI formula is protected by the Pension Clause also controls here. Because S.B. 1609's modification to the PBI formula impaired or diminished that benefit for active Plan members, it violates the Pension Clause.

### C. Contribution Rates

¶89        By contrast, contribution rates are not benefits and thus do not fall within the Pension Clause's strictures.

¶90        By their nature, pension plans fall into one of two categories: defined benefits or defined contributions. In the former, benefits are fixed but the contributions may vary; in the latter, contributions are fixed but the payouts may vary. *See, e.g.*, Crawford at 639-42.

¶91        Article 29, section 1(B) uses the term "contributions" and makes clear they are Plan "assets," providing that they are to be held in trust for the Plan's beneficiaries. Section 1(A) provides that public pension systems "shall be funded with contributions and investment earnings using

HON. HALL ᴇᴛ ᴀʟ ᴠ. EORP/STATE
JUSTICE BOLICK, joined by JUDGE TREBESCH, Dissenting in Part and
Concurring in the Judgment in Part

actuarial methods and assumptions that are consistent with generally accepted actuarial standards." That language indicates contributions are not fixed, but rather may vary over time to ensure the Plan's financial integrity. Indeed, at oral argument, plaintiffs' counsel could point to nothing in the ballot materials that would have placed voters on notice that the state could not adjust employee contribution rates to ensure the Plan's financial viability.

¶92 Thus, unlike the PBI formula to which an employee is contractually "entitled" according to statutory provisions in effect on the hiring date, *Fields*, 234 Ariz. at 219 ¶ 23, 320 P.3d at 1165, public employees are not entitled to a fixed contribution rate. Indeed, if they were, the failure to raise sufficient funds through employee contributions could jeopardize the Plan's financial viability required under article 29, sections 1(A)-(B), thus justifying the state's change to those rates. By contrast, if the entire burden of providing adequate pension contributions is placed upon the state, it would create an uncertain, open-ended, and limitless obligation that could run afoul of the Gift Clause. *See Turken*, 223 Ariz. at 351 ¶ 43, 224 P.3d at 167.

¶93 The employee contribution rate statute, A.R.S. § 38-810, has never contained language indicating an expectation or guarantee. In fact, the employee contribution rate has varied over time, including an increase from six to seven percent in 1987, shortly after EORP was created. *See* 1987 Ariz. Sess. Laws., ch. 146, § 4 (1st Reg. Sess.) (codified at A.R.S. § 38-810(A)(1987)). Arizona tax statutes also treat pension contributions and benefits differently, with the former generally shielded and the latter generally exposed to taxation. *See* A.R.S. §§ 38-810, -810.01, -811, 43-1022. Arizona contribution rate statutes thus do not exhibit the indicia of contractual entitlement that the Court found with regard to the PBI formula in *Fields*. 234 Ariz. at 219 ¶¶ 23-24, 320 P.3d at 1165.

¶94 Other courts that have considered the precise issue of whether pension contribution rates are a benefit have held they are not. In *Taylor v. City of Gadsden*, 767 F.3d 1124 (11th Cir. 2014), plaintiffs argued, as here, that they had a protected contractual pension right to a particular contribution rate. Holding the change did not violate the state or federal Contracts Clauses, the court explained, "Here, the City did not alter

HON. HALL ET AL V. EORP/STATE
JUSTICE BOLICK, joined by JUDGE TREBESCH, Dissenting in Part and
Concurring in the Judgment in Part

plaintiffs' pension *benefits*; instead, it altered their pension obligations." *Id.* at 1135.

**¶95** The Georgia Supreme Court likewise recently considered a challenge to sizable increases in employee contribution rates. The court observed that the "pension contribution increases were not retroactive and did not change a member's benefit formula, calculation of pension benefit, or actual benefit amount payable at the time of retirement." *Borders v. City of Atlanta*, 779 S.E.2d 279, 281 (Ga. 2015). The court upheld the contribution rate change because it "did not alter Plaintiffs' pension benefits, but rather modified their pension obligations, and in no manner divested Plaintiffs of their earned pension benefits, so as to implicate constitutional concerns." *Id.* at 287; *see also In re Enrolled Sen. Bill 1269*, 209 N.W.2d 200, 203 (Mich. 1973), *followed in AFT Michigan v. Michigan*, 846 N.W.2d 583, 593-94 (Mich. App. 2014).

**¶96** Furthermore, if contribution rates were benefits, we have difficulty perceiving which aspects of the pension contract would be subject to the Contract Clause rather than to the absolute prohibition against benefit impairment in article 29, section 1(C). Rather, as the Court stated in *Fields*, that special protection is reserved for benefits, which contribution rates are not. Indeed, we are loath to attribute to voters the intent to have taxpayers alone shoulder all unanticipated financial burdens of guaranteed pension payouts, absent clear evidence they were placed on notice that they were doing so when they adopted article 29, section 1.

**¶97** The majority does not address this issue, finding instead that the changes to the contribution rate violate *Yeazell*. But the concurring opinion by Judge Cattani would affirm the trial court's holding that employee contribution rates are benefits and thus unchangeable under the Pension Clause.

**¶98** Judge Cattani compares the defined-benefit contribution to an annuity. Respectfully, it is not. The common definition of annuity is "[a] fixed sum of money payable periodically." Black's Law Dictionary 105 (9th ed. 2009). The defined-benefit pension, by contrast, involves fixed benefits but requires variable payments. Judge Cattani seems to recognize that distinction by observing that if this were an annuity, the amount of payments, or cost, would "be determined upon the employee's retirement."

38

HON. HALL ET AL V. EORP/STATE
JUSTICE BOLICK, joined by JUDGE TREBESCH, Dissenting in Part and
Concurring in the Judgment in Part

But in reality, under EORP, the payments are made and calculated during employment, based not only on that particular employee's circumstances but the pension system as a whole; indeed, deferring until retirement the amount of an employee's compensation would present Gift Clause problems because it would be indeterminate and open-ended. Perhaps the legislature could improve the current system by purchasing annuities for its employees, but that is not the system before us.

¶99 Judge Cattani also observes that the system has no "modification provision" to alert employees that contribution rates might go up. Were this a real rather than fictional contract, perhaps it would contain such a provision. As with many benefits, such as health insurance, parking, or public transit passes, employee costs can vary. The benefit is the outcome, not how much it costs the employer or employee. That is the nature of a defined-benefit as opposed to a defined-contribution retirement plan. Moreover, as noted, the statutes governing employee contributions have never created an expectation or entitlement, and the rate has changed multiple times over the years. A post hoc transformation of a defined-benefit pension plan into an annuity whose cost is determined upon retirement does not alter the legal reality that employee contribution rates are not benefits.

¶100 For the foregoing reasons, the trial court erred in holding that S.B. 1609's employee contribution rate increase violates the Pension Clause, the sole basis for its ruling on contribution rates.

## D. The Contract Clause and *Yeazell*

¶101 The majority bases its decision striking down the contribution rate changes on its view that *Yeazell* allows no changes whatsoever to a pension plan that are to the members' disadvantage, absent the members' consent. As we noted earlier, that conclusion misreads *Yeazell*, which expressly recognizes contract defenses such as mutual mistake regarding the Plan's actuarial soundness. 98 Ariz. at 116, 402 P.2d at 546. It also ignores the constitutional changes that significantly alter our jurisprudential landscape.

¶102 The majority says we "over-read" *Yeazell* because although it recognizes the mutual mistake defense, the Court stated it did "not, however, mean to imply what rights or remedies might be available to

HON. HALL ET AL V. EORP/STATE
JUSTICE BOLICK, joined by JUDGE TREBESCH, Dissenting in Part and
Concurring in the Judgment in Part

either party in a situation where it is established that a retirement plan is actuarially unsound. This is a matter beyond the issues of the present litigation." *See* ¶ 24 (citing *Yeazell*, 98 Ariz. at 117, 402 P.2d at 546). But that is precisely the issue in *this* litigation; and whatever "rights or remedies might be available," it is judicial abdication to preemptively foreclose them.

¶103 Because this case was decided on cross-motions for summary judgment, the trial court made no factual findings on contract defenses. As this Court is not affirming the trial court's ruling that the change in employee contribution rates violates the Pension Clause, and as the parties below fiercely contested the factual issues pertaining to contract defenses, affirming the summary judgment is manifestly inappropriate. *See* Ariz. R. Civ. P. 56(a); *see also Peterson v. Valley Nat. Bank of Phoenix*, 90 Ariz. 361, 362, 368 P.2d 317, 318 (1962) (stating summary judgment inappropriate where there are material contested issues of fact or where there is the slightest doubt as to the facts).

¶104 Rather than remand the issue for factual determination, the majority dons trial court robes to determine that EORP and the State are "unable to prove that defense." Selectively reviewing the record, the majority finds that the Plan's financial worries are attributable solely to EORP's investment choices, and states that "disappointment about anticipated investment returns does not qualify as a [mutual] mistake." *See* ¶ 26. Not only that, but "the Plan's actuarial soundness is within the Legislature's control," because it can always increase taxes and court fees, apparently *ad infinitum. Id.* In reality, EORP presented evidence of a variety of causes, and did not learn until a 2010 audit that the Plan was severely unfunded. Until then, all parties labored under the assumption that the Plan was actuarially sound—an assumption that proved to be mistaken. By finding otherwise, the majority short-circuits the mistake of fact analysis that *Yeazell* expressly recognizes.

¶105 The majority errs even more fundamentally by beginning and ending its analysis with *Yeazell*. Article 29, section 1 now governs the contractual relationship regarding public employee pensions. Section 1(C) very plainly states that although benefits are sacrosanct, other parts of the pension contract are governed by the Contract Clause. We said as much in *Fields*, 234 Ariz. at 218 ¶ 17, 320 P.3d at 1164 ("The Contract Clause applies to the general contract provisions of a public retirement plan, while the

HON. HALL ET AL V. EORP/STATE
JUSTICE BOLICK, joined by JUDGE TREBESCH, Dissenting in Part and
Concurring in the Judgment in Part

Pension Clause applies only to public retirement benefits."). As noted previously, we cannot assume that the amendment's drafters were ignorant of past governing law and the significant change effected by the ballot language. Our job is to enforce that language, not ignore it.

¶106 But ignore it the majority does, justifying itself with the proposition, remarkable on multiple levels, that "analyzing whether the Bill would pass review under the Contract Clauses were it not for *Yeazell* and the Gift Clause is unnecessary and violates the principle of judicial restraint." *See* ¶ 28. Article 29, section 1 governs public pensions. It does so in all, not just some, of its particulars. Declining to apply all of its provisions is not judicial restraint but pick-and-choose jurisprudence.

¶107 As we decided in *Fields*, public pension contract terms that are not benefits are subject to the Contract Clause. Neither this Court nor the trial court made the requisite determination that the contribution rate changes violate the Contract Clause; thus, remand is imperative. *See State v. Brita*, 158 Ariz. 121, 124, 761 P.2d 1025, 1028 (1988) ("It is highly undesirable to attempt to resolve issues for the first time on appeal, particularly when the record below was made with no thought in mind of the legal issue to be decided."). But even so, based on available facts and contrary to the majority's conclusion, the record is quite clear that the changes constitute "a significant and legitimate public purpose," and that the impairment is reasonable and appropriate. *Fund Manager, Pub. Safety Pers. Ret. Sys.*, 151 Ariz. at 491, 728 P.2d at 1241. Averting a pension crisis and protecting the Plan's actuarial soundness are not only significant and legitimate, they are the very essence of the constitutional guarantees the voters approved. The Plan members' contribution rate increases are dwarfed by the increased taxpayer contributions. Senate Bill 1609 takes pains to not displace the state's obligations or to raid pension funds. Based on the record, we would uphold the contribution rate changes under the Contract Clause (and therefore under article 29, section 1(C)). At the very least, we would remand to the trial court to determine this question in the first instance.

## III.

¶108 If ever there were a case in which we should seriously indulge the presumption of statutory constitutionality, this is it. The majority winks

HON. HALL ET AL V. EORP/STATE
JUSTICE BOLICK, joined by JUDGE TREBESCH, Dissenting in Part and
Concurring in the Judgment in Part

at that rule, then utterly fails to apply it.  It repeatedly invokes the mantle of judicial restraint while casually invalidating a statute designed to preserve the financial stability of a public employee pension plan, a purpose so important that the voters made it part of our state's organic law.

**¶109**　　　　The majority opinion portends a huge financial windfall for the class members, a burden the taxpayers will shoulder.  Under such circumstances, we should act with great restraint, lest the rule of law be undermined by a public perception that this decision is of the judges, by the judges, and for the judges.  On this important issue, the majority exhibits no such restraint, and we therefore respectfully dissent.